UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DAWN RILEY,

                          Plaintiff,

        v.

HSBC USA, INC.,
HSBC BANK USA, NATIONAL ASSOCIATION,

                        Defendants.

_____

**REPORT
and
RECOMMENDATION**

08-CV-00919S(F)

APPEARANCES:        BROWN & TARANTINO, LLP
                        Attorneys for Plaintiff
                        KEVIN P. WICKA, of Counsel
                        1500 Rand Building
                        14 Lafayette Square
                        Buffalo, New York 14203

                        PHILLIPS LYTLE LLP
                        Attorneys for Defendants
                        JAMES R. GRASSO, of Counsel
                        3400 HSBC Center
                        Buffalo, New York 14203

                        TRACY SENDOR WOODROW
                        SENIOR COUNSEL, HSBC BANK
                        Attorney for Defendants
                        HSBC Center
                        Buffalo, New York  14203

## <u>JURISDICTION</u>

This action was referred to the undersigned by Honorable William M. Skretny on April 30, 2010, for pretrial matters including report and recommendation on dispositive motions.  The matter is presently before the court on Defendants' motion for summary judgment (Doc. No. 26), filed April 28, 2010.

## BACKGROUND

Plaintiff Dawn Riley ("Plaintiff" or "Riley"), commenced this action on December 16, 2008, alleging employment discrimination based on race by Defendants HSBC USA, Inc.  ("HSBC USA"), and HSBC Bank USA, National Association ("the Bank") (together, "Defendants"), in violation of Title VII, 42 U.S.C. § 2000e-5, and New York Human Rights Law, New York Executive Law ("N.Y. Exec. Law")[1] § 290 *et seq*.  On January 14, 2009, Defendants filed an answer (Doc. No. 4).  According to a scheduling order filed December 21, 2009 (Doc. No. 21), discovery concluded on February 12, 2010.

On April 28, 2010, Defendants filed the instant motion for summary judgment (Doc. No. 26) ("Defendants' motion"), along with supporting papers including Defendants' Statement of Undisputed Material Facts (Doc. No. 27) ("Defendants' Statement of Facts"), the Declaration of Joseph Walker (Doc. No. 28) ("Walker Declaration"), the Declaration of Darcie J. Oakes (Doc. No. 29) ("Oakes Declaration"), the Declaration of James R. Grasso, Esq. (Doc. No. 30) ("Grasso Declaration"), with attached exhibits A through H ("Grasso Declaration Exh(s). __"), the Declaration of Linda Bartholomew (Doc. No. 31) ("Bartholomew Declaration"), with attached exhibits A through F ("Bartholomew Declaration Exh(s). __"), and Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment (Doc. No. 32) ("Defendants' Memorandum").  On June 11, 2010, Plaintiff filed in response to Defendants' motion Plaintiff's L.R. 56.1 Counterstatement of Material Facts and Responses to Defendants'

---

[1] Unless otherwise indicated, references to "N.Y. Exec. Law" are to McKinney's 2010.

L.R. 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment (Doc. No. 37) ("Plaintiff's Statement of Facts"), attached to which are Plaintiff's exhibits A through X ("Plaintiff's Exh(s). __"), the Declaration of Kevin P. Wicka, Esq. (Doc. No. 38) ("Wicka Declaration"), the Declaration of Dawn Riley (Doc. No. 39) ("Riley Declaration"), and Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment (Doc. No. 40) ("Plaintiff's Memorandum").  On June 25, 2010, Defendants filed the Reply Declaration of Linda Bartholomew (Doc. No. 42) ("Bartholomew Reply Declaration"), with attached exhibits A through D ("Bartholomew Reply Exh(s). __"), the Declaration of Kelly Ann Hebeler (Doc. No.  43) ("Hebeler Declaration"), attached to which are copies of Plaintiff's employment discrimination charge filed with the Equal Employment Opportunity Commission ("EEOC"), and supporting exhibits, and Defendants' Reply Memorandum of Law in Support of Their Motion for Summary Judgment (Doc. No. 44) ("Defendants' Reply").  Oral argument was deemed unnecessary.

Based on the following, Defendants' motion for summary judgment should be GRANTED in part, with regard to the request that HSBC USA be dismissed as a defendant to the action, but otherwise should be DENIED as to the Bank.


### FACTS[2]

Plaintiff Dawn Riley ("Plaintiff" or "Riley"), who is white, commenced working at Defendant HSBC Bank USA, National Association ("Defendant" or "the Bank") in

---

[2] Taken from the pleadings and motion papers filed in this action.

February 1988,[3] where she continued to work until February 22, 2007, at which time her employment was terminated as a result of a 'reduction-in-force.'  Plaintiff's highest level of education is high school.  Throughout Plaintiff's employment at the Bank, Plaintiff worked in various positions for the Bank and its subsidiary HSBC Mortgage Corp. ("Mortgage Corp.").  Although all of Plaintiff's positions were clerical, Plaintiff  was promoted at least seven times, and regularly received satisfactory job performance reviews and pay increases.  In May 2005, Plaintiff, then working as a Mortgage Corp. Sales Assistant, applied for the position of Community Reinvestment Act ("CRA") Product and Mapping Analyst ("CRA Analyst"), a clerical position within the Bank's Community Development Department ("CDD").  The CRA Analyst position for which Plaintiff applied had become vacant when Joseph Liermo ("Liermo"), who is white, left the position.  Plaintiff first interviewed for the CRA Analyst position with CDD Vice President and Regulatory Reporting Manager Linda Bartholomew ("Bartholomew"), and then interviewed with Bartholomew's supervisor, Senior Vice President Dan Nissenbaum ("Nissenbaum").  Bartholomew, who was hired by the Bank in 1987, obtained her CDD position in 1997.  Although Nissenbaum was responsible for the CDD, he was located in the Bank's New York City office, whereas Bartholomew worked in Buffalo.  Upon being selected by the CDD[4] for the CRA Analyst position in May 2005,

_____

[3] When Plaintiff commenced her employment, the Bank was known as Marine Midland Bank, National Association ("Marine Midland").  The date the Bank's name was changed to HSBC Bank USA, National Association, is not in the record.  For purposes of clarity and consistency, the court refers to Defendant only as "the Bank" and does not further identify the specific name of Defendant at any particular time, given that fact is not relevant to disposition of any issue in this action.

[4] According to Plaintiff, HR advised that Plaintiff had been chosen for the CRA Analyst position, Riley Declaration ¶ 13, whereas Defendants maintain the decision to hire Plaintiff in CDD was made by both Bartholomew and Nissenbaum.  Bartholomew Dep. Tr. at 45-46.

Plaintiff commenced working in the CDD, where she reported directly to Bartholomew. At all times relevant, one Anthony Manna ("Manna"), as Assistant Vice President ("AVP"), Human Resources ("HR") Generalist, provided human resources support to several departments at the Bank, including Commercial Real Estate, Community Development, Credit, and Middle Marketing Lending.

Plaintiff's move into the CRA Analyst position, where she was responsible for collecting and reporting Home Mortgage Disclosure Act ("HMDA") and CRA-related data, was a lateral move from her previous position as a Mortgage Corp. Sales Assistant.  A copy of the CRA Analyst position's job description, Bartholomew Declaration Exh. A, lists among the position's requisite knowledge, skills and abilities (1) two years HMDA or CRA-related experience, project management experience, or the equivalent; (2) Bachelors degree in business or related field, or equivalent experience; (3) communications, analytical, organizational, project management and planning skills; (4) proficiency with personal computers, pertinent mainframe systems and software packages; (5) strong skills in data analysis and management and computer systems programming; (6) understanding of Fair Lending laws, HMDA, CRA, other similar regulations and related Company policies, procedures and controls; and (7) the ability to work in an environment with tight time demands.[5]   Although strong computer systems programming skills are listed as required for the CRA Analyst position, the job description does not list computer programming among the CRA Analyst's principal responsibilities.

---

[5] The job description indicates it was revised in September 2006, but the nature of the revisions is not in the record.

Upon joining the CDD, the only other employee holding the same CRA Analyst position was one Linda Russo ("Russo"), who was white.  Russo initially trained Plaintiff as a CRA Analyst, but within a few months of Plaintiff's arrival, Russo left the CDD for another position within the Bank.  After Russo left the CDD, Plaintiff continued to learn the CRA Analyst job duties through "self-training" by reading procedure manuals. Plaintiff's Deposition Transcript ("Plaintiff's Dep.  Tr.")[6] at 54.[7]  In August 2005, Letitia Adams ("Adams"), who is African-American, was hired for the position of Senior CRA Product and Mapping Analyst ("Senior CRA Analyst") in the CDD.  The Senior CRA Analyst position for which Adams was hired was created after Russo left the CDD.[8] Upon her hire, Adams, like Plaintiff, reported to Bartholomew.

The CDD used a computer program called CRA-Wiz to process data and generate its HMDA and CRA reports.  Although Adams's Senior CRA Analyst position required more technical skills than Plaintiff's CRA Analyst position, and required Adams to perform computer programming and fix CRA-Wiz programming problems, Plaintiff helped train Adams, who had no prior experience in the CDD or its functions, including familiarity with CRA and HMDA regulations, or using the CRA-Wiz program.  Plaintiff did not perform any CRA-Wiz programming or troubleshooting.

During the first quarter of each new calendar year, an "Employee Performance Management" or "EPM" was created for each employee containing the employee's

---

[6] Grasso Declaration Exh.  D.

[7] It is unclear from the record who, if anyone, continued Plaintiff's training after Russo left the CDD, or whether Plaintiff then relied only on "self-training."

[8] The record is silent as to whether the CRA Analyst position vacated by Russo was ever filled, or simply replaced with the Senior CRA Analyst position held by Adams.

goals and objectives for the new year, along with anticipated completion dates for each goal and objective.  The EPM contains a section entitled "MIP Goals"[9] which, according to Bartholomew, provided the anticipated completion date for each EPM goal, and depending on whether the goals were timely reached, would ultimately determine the amount of an employee's year-end bonus, which could range from 5 % to 10 % of an employee's salary.  Bartholomew Dep. Tr. at 64.  The EPM becomes a framework for the mid-year and year-end reviews.  Bartholomew prepared the EPMs for each employee Bartholomew supervised, including Plaintiff and Adams.  After preparing the respective EPMs for 2006, Bartholomew  submitted them to Nissenbaum for approval before delivering the EPMs to each employee.  No goal or objective on Plaintiff's EPM for 2006 pertains to any technical responsibilities, computer programming or programming of CRA-WIZ, although Adams's 2006 EPM indicates Adams is responsible for "identify[ing] all technical issues, . . . provid[ing] technical assistance in developing solutions," and "ensur[ing] all systems are stable and providing expected data results."  Adams's 2006 EPM.[10]  Walker's 2006 EPM indicates that Walker also was assigned essentially similar technical responsibilities.  Walker's 2006 EPM.[11]

The Bank's performance review policy includes issuing mid-year and year-end reviews, at which time employees receive job performance ratings from 1 (highest) to 5 (lowest), indicating whether specific objectives have been met.   Each employees's

---

[9] The acronym "MIP" is not further defined in the record, nor was Bartholomew able to explain the term "MIP objectives."  Bartholomew Dep.  Tr.  at 64 ("These are so confusing.").

[10] Plaintiff's Exh. W.

[11] Plaintiff's Exh.  V.

overall rating affects an employee's raise and year-end bonus eligibility.  A rating of 3 indicates the employee meets job expectations or satisfactory job performance, and is the minimum rating required for an employee to receive a year-end bonus.  Any employee whose overall year-end rating is 4 or 5 is ineligible to receive a year-end bonus.  Bartholomew prepared the mid-year and year-end reviews for the employees in the CDD in Buffalo including Plaintiff and Adams.

Plaintiff's year-end overall rating for 2005 was a 3, indicating Plaintiff had met all expectations as a CRA Analyst despite Plaintiff's limited seven-month period of employment in the CDD for 2005, and Plaintiff received a year-end bonus for 2005 based on her satisfactory year-end rating.  Adams's year-end overall rating for 2005 was a 4, indicating Adams's job performance as Senior CRA Analyst was inconsistent and not at a minimally satisfactory level.  According to Bartholomew, despite satisfactorily performing the technical aspects of her Senior CRA Analyst job, Adams had "attitude problems," displaying an attitude Bartholomew described as "very bad" and "belligerent."  Bartholomew Deposition Transcript ("Bartholomew Dep. Tr.")[12] at 57. According to Bartholomew, Adams generally had a good working relationship with her co-workers within the CDD, but sometimes was disrespectful when speaking on the telephone with others outside the department, and was "very disrespectful" toward Bartholomew.  Id. at 61-63.   Bartholomew explained that she rated Adams a 4 overall because of an interim job discussion ("IJD") Bartholomew had with Adams regarding her bad attitude.  Bartholomew Dep. Tr. at 57.  The IJD serves as a written warning to

---

[12]  Grasso Declaration Exh. E; Plaintiff's Exh. F.

an employee.  Nissenbaum Deposition Transcript ("Nissenbaum Dep. Tr.")[13] at 29;

Manna Deposition Transcript ("Manna Dep. Tr.")[14] at 30.  Although Adams had been

issued an IJD during 2005, Adams's year-end review for 2005 contained no negative

comments, whereas Plaintiff's year-end review for 2005 contained one critical

comment, *i.e.*, that Plaintiff needed to pay more attention to detail.  Bartholomew admits

that because any significant issues with an employee's performance should be noted in

the employee's year-end performance review, Bartholomew's failure to include any

reference to the IJD in Adams's year-end 2005 review rendered such review less than

entirely accurate, *id*. at 63-64, and Manna agrees that the issuance of an IJD should

have been included in an employee's year-end review.  Manna Dep. Tr. at 47.

Despite being rated only a 4 for 2005, which rendered Adams ineligible for a

year-end bonus, Bartholomew, in 2006, took Adams "off the IJD" and retroactively

awarded Adams a bonus for 2005.  Bartholomew Dep. Tr. at 107-08.  Neither

Nissenbaum nor Manna could recall that any other employee ever received a

retroactive year-end bonus after receiving an overall rating of 4.  Nissenbaum Dep. Tr.

at 53-54; Manna Dep. Tr. at 35-36.  Nor does the record indicate whether Bank

procedures permitted or were followed in removing Adams from the IJD and

retroactively awarding Adams a year-end bonus for 2005.  Nothing in the record

indicates Plaintiff was ever the subject of an IJD, including while employed as a CRA

Analyst in the CDD or in any other Bank department.

On June 29, 2006, Adams commenced a maternity leave which was expected to

---

[13] Plaintiff's Exh. G.

[14] Plaintiff's Exh. H.

continue until mid-October 2006.  While Adams was on maternity leave, Plaintiff, in addition to her own job duties, was assigned to perform all of Adams's daily Senior CRA Analyst duties, but did not work on Adams's long-term projects because there was not enough time to do so.  An e-mail from Bartholomew on June 29, 2006 ("June 29, 2006 Bartholomew e-mail")[15] instructed the CDD employees and other employees who worked with the CDD that, in Adams's absence, any requests that would normally go to Adams should be directed to Bartholomew with copies to Plaintiff.

On July 10, 2006, Joseph Walker ("Walker"), an African-American, was hired for another CRA Product and Mapping Analyst position in the CDD.  Walker's CRA Analyst position was the same as Plaintiff's CRA Analyst position.  Walker was first hired as a Bank employee on October 31, 2002, as a Post-Closing Specialist with the Bank's Mortgage Corp.  Prior to working in the CDD, Walker had no experience working with the CRA, the HMDA, or the CRA-Wiz computer program.  When Walker was hired as a CRA Analyst, he held an Associate's degree in Computer Information Systems, and was pursuing a Bachelor's degree in Computer Information Systems, which Walker received in the spring of 2008.  Plaintiff was assigned to train Walker.

On Plaintiff's 2006 mid-year evaluation, which Plaintiff received in August 2006, Riley Declaration ¶ 26, Bartholomew gave Plaintiff an overall rating of 4.  Previous to the 2006 mid-year evaluation, Plaintiff had never received a rating below 3.  According to Bartholomew, Plaintiff's 2006 mid-year rating of 4 was based on Plaintiff's lack of focus on details, and Plaintiff's reliance on Adams to resolve problems with trouble-shooting and programming the CRA-Wiz program.  Bartholomew Declaration ¶ 13;

---

[15] Plaintiff's Exh. O.

Plaintiff's 2006 Mid-Year Review.[16]  Although Plaintiff was not issued an IJD regarding
her shortcomings, Bartholomew explains that "the issuance of an IJD was at the total
discretion of the supervisor. . . . General poor performance was documented in the mid-
year and year-end reviews," and Plaintiff had not engaged in any conduct warranting
discipline and an IJD.  Bartholomew Reply Declaration ¶¶ 17-18.  Although Plaintiff's
2006 mid-year job performance was assessed as a 4, Bartholomew maintains that
Plaintiff's job "performance was simply below expectations.  While a continued
prolonged period of performance at a 4 level might have eventually led to termination,
plaintiff was not yet at that juncture."  *Id*. ¶ 18.  Bartholomew denies any knowledge at
the time of Plaintiff's 2006 mid-year evaluation of the possibility that some of the Buffalo
CDD work might be transferred to Chicago, resulting in the elimination of a Buffalo
position.  *Id*. ¶ 4.

Despite the 2005 mid-year rating of 4, on August 22, 2006, Plaintiff was
assigned additional duties under Phil Deterville ("Deterville"), another CDD employee.
Plaintiff's work under Deterville was estimated to require 20% of Plaintiff's time, and
included such duties as wire transfers, general ledger entries, monthly account
reconciliations, and proofs of the CDD's accounts.  Although Nissenbaum instructed
Bartholomew to amend Plaintiff's 2006 EPM to reflect Plaintiff's work for Deterville,
Plaintiff's Exh. R, no such change was ever made.

Thus, by September 2006, Plaintiff, in addition to performing the daily duties as a
CRA Analyst, Plaintiff also performed Adams's Senior CRA Analyst duties while Adams

---

[16] Bartholomew Declaration Exh. C; Plaintiff's Exh. P.

was on maternity leave, trained Walker, and performed work for Deterville.  When

Adams returned from her maternity leave in October 2006, Walker was still learning the

duties for his CRA Analyst position and continued to receive training from Plaintiff.

Walker also received training from Bartholomew and from Adams by telephone during

Adams's maternity leave.

      While employed in the CDD, Plaintiff worked primarily with small business

reporting under the CRA, Adams focused on HMDA reporting, and Walker focused on

map production.  Plaintiff, Adams and Walker were largely cross-trained, with Plaintiff

able to perform Adams's and Walker's jobs, Walker and Adams could perform Plaintiff's

job, and Walker also able to perform some of Adams's job while Adams was on

maternity leave.[17]  Plaintiff, Bartholomew, Adams, and Walker sat in cubicles located

near each other in the CDD.  Because the cubicles were open and without doors, the

employees generally could hear each other's conversations.

      Plaintiff maintains that although Walker was regularly late for work and took

extended lunches, including arriving more than 40 minutes late for a meeting while on a

business trip in the fall of 2006, Walter was never reprimanded by Bartholomew.

Plaintiff's Statement of Facts ¶¶ 56-57.  Rather than reprimanding Walker,

Bartholomew complimented Walker's appearance and dress.  *Id*. ¶ 58.

      One of Adams's on-going projects as a Senior CRA Analyst was to automate the

CRA State Report Card ("State Report Card"), a monthly report used to ascertain the

Bank's loan officers' performance compliance with respect to CRA and HMDA.

Plaintiff's Statement of Facts ¶ 60.  Automating the State Report Card would alleviate

---

[17] The record does not indicate whether Adams was able to perform Walker's job.

the need for employees to manually input data to create the report.  *Id*.  According to

Plaintiff, throughout the time Plaintiff worked with Adams, the automated program

properly worked only once, and every other time contained errors that had to be

manually corrected, that Plaintiff was responsible for making the manual corrections,

causing the report to be filed late each month, for which Bartholomew criticized only

Plaintiff, and never Adams.  *Id*. ¶¶ 61-62.

Plaintiff maintains that several remarks by Bartholomew, which Bartholomew

does not deny making, indicate Bartholomew's preference for African-American

workers, rather than white workers.  In December 2006, Bartholomew announced at a

meeting with "the whole department," Bartholomew Dep. Tr. at 220, described as

including Bartholomew, Plaintiff, Adams, Walker, one Karla Gadley (Gadley), who is

African-American, and one Phil Deterville ("Deterville"), who is white, that Bartholomew

believed she was a "black person" in a previous life, "dreams about black people," and

"loves black music."  Plaintiff's Statement of Facts ¶¶ 64-65 (quoting Riley Declaration ¶

40; and Bartholomew Dep. Tr. at 220-23).  Although Bartholomew characterized her

statements as "joking," Bartholomew Dep. Tr. at 222, Plaintiff maintains no one laughed

at them and, following the meeting, Plaintiff, Walker, and Adams discussed how "odd"

the comments were.  Plaintiff's Statement of Facts ¶¶ 65-66 (quoting Riley Declaration

¶ 42).

Both before and after Adams's maternity leave, Bartholomew stated she wanted

to be Adams's baby's "white grandmother."  Plaintiff's Statement of Facts ¶ 67 (quoting

Riley Declaration ¶ 43; Bartholomew Dep. Tr. at 228).  Bartholomew admits making the

statement, *id*. ¶ 68 (citing Bartholomew Dep. Tr. at 228), but, other than that

Bartholomew was aware that Adams's family lived out of town, Bartholomew was unable to explain why she perceived it relevant to consider herself as the baby's "white" grandmother.  Defendants' Statement of Facts ¶ 75 (citing Bartholomew Dep. Tr. at 228 and Plaintiff's Dep. Tr. at 78-80).  According to Plaintiff, Adams "looked surprised" when Bartholomew made the "white grandmother" statement.  Plaintiff's Statement of Facts ¶ 69 (quoting Riley Declaration ¶ 43).

On another occasion, while Walker and Plaintiff were talking at Plaintiff's cubicle about Walker's church, Bartholomew walked over and stated she would like to attend Walker's church with him.  Plaintiff's Statement of Facts ¶ 70.  When Walker responded that most of the congregation "did not look like Linda Bartholomew," Bartholomew replied that she wanted to go even though she is "white."  *Id*.  (quoting Riley Declaration ¶ 44).  Plaintiff further alleges Bartholomew repeatedly complimented Walker on his dress and appearance.  Riley Declaration ¶ 35.

Bartholomew had tacked to the wall of her cubicle photographs of Bartholomew and Walker, and Bartholomew and one Loretta Abrams ("Abrams"), who was Bartholomew's second line manager to whom Nissenbaum reported, and who also is African-American.  Bartholomew did not have on display in her office any pictures of Plaintiff, Nissenbaum, or Deterville.

Prior to the end of 2006, Bartholomew was advised that a shift of some work from the Bank's Buffalo CDD to Chicago would likely result in a reduction-in-force at the Buffalo office, requiring the elimination of one of the CDD's CRA Analyst positions.  Bartholomew identified Plaintiff, Walker, and Adams as the three CRA Analysts from which the one to be terminated would be chosen.  Plaintiff maintains Bartholomew's

decision as to which of the three identified employees would be terminated was made prior to completing the year-end 2006 reviews.

In a January 2, 2007 e-mail to Bartholomew ("January 2, 2007 Nissenbaum e-mail"),[18] Nissenbaum states that upon reviewing Bartholomew's draft of Plaintiff's 2006 year-end evaluation,[19] he wished to discuss some items with Bartholomew, including adding a "significant example" to substantiate a lower year-end rating, "not to pile on, but rather to illustrate the frequency and range of the issues," as well as ensuring the "Comments section covers each and all of the Goals, both positively and negatively. Particularly where there were specific time frames – were those met?"  January 2, 2007 Nissenbaum e-mail.  Nissenbaum inquired as to what would be Plaintiff's overall year-end rating, and requested Bartholomew "be sure to include reference to the variety of times you have coached provided training, support, warned, etc. on these issues."  *Id*. Nissenbaum also asked whether Plaintiff had met any of her 2006 MIPs.  *Id*. Nissenbaum's final comment was:

> Sounds like the major issues are:
> 1.   being more proactive in general
> 2.   Meeting deadlines, deliverables (could bring out a bit more)
> 3.   accuracy of work.

*Id*.

In response, Bartholomew, by e-mail dated January 3, 2007 ("January 3, 2007 Bartholomew e-mail"),[20] advised that she would "include some other examples.  I am

---

[18] Bartholomew Reply Declaration Exh. A.

[19] No copy of Plaintiff's draft 2006 year-end review is in the record.

[20] Bartholomew Reply Declaration Exh. B.

trying to be somewhat sensitive to her feelings, I don't want to beat her with a sledge hammer.  (I know that you are not suggesting that, but I am trying to cushion some of this since it is a bad review)."  In answering Nissenbaum's inquiry as to whether Plaintiff met any of her 2006 MIPs, Bartholomew stated that Plaintiff missed a December 5, 2006 deadline to "update procedures," and that although Plaintiff did complete automating "the process for the importation of Wiz files into the state report card," Adams "took the lead on it."  January 3, 2007 Bartholomew e-mail.  Bartholomew attached a new draft of Plaintiff's 2006 year-end review to a second e-mail to Nissenbaum on January 3, 2007, asking for Nissenbaum's review.  Bartholomew Reply Declaration Exh. C.  Bartholomew's Management Comments in the attached draft of Plaintiff's year-end review criticize Plaintiff for failing to "show initiative in all aspects of her job," documentation errors, delaying and sometimes requiring redistribution of corrected reports, failing to cross-train on additional CRA-Wiz functionality such that Plaintiff was unable to field inquiries or resolve issues that arose during Adams's maternity leave, lack of attention to detail, causing typographical errors in file names and dates, directing calls and inquiries relating to regulatory matters to Bartholomew rather than performing the necessary research herself, and spending increased time on personal matters.  *Id*.  Bartholomew's proposed ratings for the three separate objectives sections of Plaintiff's 2006 EPM were 4, 5, and 4, with a proposed overall year-end rating of 4.  *Id*.

In a January 5, 2007 e-mail to Nissenbaum ("January 5, 2007 Bartholomew e-

mail"),[21] Bartholomew acknowledged she agreed that both Plaintiff and Walker had the same job description and job responsibilities, which could pose a problem in determining whether to terminate Plaintiff or Walker if both received the same year-end job performance rating.  The full text of the January 5, 2007 Bartholomew e-mail is as follows:

> As you mentioned on the phone, Dawn and Joe have the same job description/responsibilities.  If we rate Dawn a "3 - Meets expectations of the job," how are we going to justify/explain that HER role is being eliminated, but Joe who has less experience, less time on the job, and is also rated a 3 stays, but she has to find another job?
>
> If Dawn is truly performing at a "meets expectations" level, (which she is not,) she has a legitimate argument/case that Joe should be the one to go if we have to lose a req.
>
> That is another reason we need to give this more thought before you decide to have me change her rating from 4 to 3.  *We can justify keeping Joe instead of her if she isn't doing the job, but we can't if we rate them the same for the same job.*
>
> I think you are wise to speak with Anthony Manna about it first.

January 5, 2007 Bartholomew e-mail (italics added).

In a series of e-mails[22] exchanged on January 9 and 10, 2007, between Nissenbaum, Manna, HSBC HR Vice President Michelle Oaks ("Oaks"),  and Gary Gawel ("Gawel"), of the Bank's Equal Employment Opportunity ("EEO") Compliance office, the proposed elimination of Plaintiff's CRA Analyst position was discussed with regard to whether Plaintiff's termination would raise any employment discrimination issues.  On January 9, 2007, Manna forwarded to Gawel an e-mail from Nissenbaum

---

[21] Plaintiff's Exh. T.

[22] Plaintiff's Exh. F.

regarding the transfer of work from Buffalo to Chicago, and advising Gawel that the work transfer would result in the elimination in Buffalo of one of the CRA Analysts positions held by Plaintiff, Adams, and Walker, all of whom reported to Bartholomew. According to Manna, the CDD had identified Plaintiff's position as the one to be eliminated based on the fact that Plaintiff "was rated a "4" at mid year and "4" at year end."  Plaintiff's Exh.  F at 2.  As such, Plaintiff had not performed as well as Adams and Walker, who received 2006 year-end job performance ratings of 3, but Manna "just wanted to make sure that there were no issues with this prior to moving forward with the RIF."  *Id*.  Upon receiving Manna's e-mail, Gawel, on January 9, 2007, sent an e-mail to Oaks requesting an adverse impact report ("AI") of the proposed termination of Plaintiff. *Id*.  Oaks responded by e-mail the next day, although no copy of the AI is in the record. *Id*. at 1.  By e-mail to Manna on January 10, 2007, to which a copy of the AI was attached,[23] Gawel advised "[b]ased on the information provided in this email, there are no race, age or gender issues for Dawn Riley, assuming her position is being eliminated due to a reduction in force and will not be replaced."  *Id*.

Despite Nissenbaum's instruction to Bartholomew on August 22, 2006, Bartholomew never amended Plaintiff's 2006 EDM to reflect the additional duties Plaintiff assumed under Deterville in August 2006. On the 2006 year-end evaluations, Bartholomew gave Plaintiff an overall rating of 4, and gave Walker and Adams overall ratings of 3.  Plaintiff's year-end review contains comments by Bartholomew criticizing Plaintiff for filing monthly State Report Cards late, but does not mention that Plaintiff

---

[23] Although Gawels' January 10, 2007 e-mail to Manna indicates a copy of the AI is attached, the AI is not in the record.

had to spend considerable time making manual corrections to the State Report Card

which had not been properly automated by Adams.  Bartholomew also failed to report

the additional work Plaintiff performed during Adams's four-month maternity leave,

training Walker, and working for Deterville.  Although Bartholomew admitted that

Plaintiff "did the bulk of the training" of Walker, Bartholomew Dep. Tr. at 88, there is no

mention of such training on Plaintiff's 2006 year-end assessment 's year-end review, or

how effective it was.

In contrast, Bartholomew noted on Adams's 2006 year-end review that "Letitia

has worked closely with Joe Walker, our newest Jr. Analyst, by providing technical

assistance and guidance on a regular basis."  Bartholomew Dep. Tr. at 88, Plaintiff's

Exh. W.  Adams's 2006 year-end review also states that

> Letitia automated the monthly CRA State Report Card.  Prior to the automation
> of this process, the data was manually input into an excel [*sic*] spreadsheet on a
> monthly basis.  The automation of this process has resulted in significant time
> savings and better overall data integrity.

Plaintiff's Exh.  W.

Adams's year-end review does not reflect the problems Adams experienced in

attempting to automate the State Report Card process, which Plaintiff had to manually

correct, but does contain comments criticizing Adams for failing to show initiative with

regard to regulatory matters so as to avoid having to direct calls and inquiries to

Bartholomew, failing to consistently review and "make sure that the work completed by

the junior analysts is error free and accurate before it is submitted to management for

distribution," and that, despite observed improvement, Adams "needs to continue to

work on being more open and poised, and less defensive when receiving constructive

feedback." *Id*. Adams's 2006 EPM included five separate objectives, four of which Adams was assessed at 3, and one at 2, for an overall 2006 year-end rating of 3. *Id*.

Walker's 2006 EPM contained four separate objectives, for which Walker was rated 3, for an overall year-end rating of 3. Plaintiff's Exh. V. Walker's 2006 year-end review contains no negative comments or criticisms. *Id*.

On January 18, 2007, Plaintiff was advised at a meeting with Nissenbaum and Bartholomew that the Bank was eliminating one of the CRA Analyst positions, and that Plaintiff's position had been selected for termination based on Plaintiff's 2006 year-end performance review, which Plaintiff had not yet seen. Plaintiff was given a folder containing information pertaining to a severance package and advised to contact the Bank's HR Department with any questions. Plaintiff was further advised she could continue working in her CRA Analyst position until the year-end 2006 CRA exam was completed, which usually occurred in early March each year, and that Plaintiff could post internally for vacant Bank positions.

Plaintiff remained at her job for several weeks, during which time Plaintiff posted for several open Bank positions. Plaintiff, however, was informed that she had not been selected for any vacant position because Plaintiff's 2006 year-end review had yet to be finalized. Plaintiff maintains that upon requesting Bartholomew issue Plaintiff's year-end review, Bartholomew replied that Plaintiff's final review would discourage anyone from hiring Plaintiff. Riley Declaration ¶ 50.

In mid-February 2007, Plaintiff was issued her final 2006 year-end review, showing Plaintiff's overall rating as 4, indicating inconsistent job performance and that none of the goals established for Plaintiff on her 2006 EPM had been met. The

proposed comments Bartholomew included in the draft of Plaintiff's 2006 year-end job performance evaluation for Nissenbaum's review, Bartholomew Reply Declaration Exh. C, were included in the final draft, along with Barthlomew's earlier proposed ratings for the three separate objectives sections of 4, 5, and 4, with an overall year-end rating of 4.  Plaintiff's Exh.  U.

The Bank's year-end reviews are generated by a computer system that permits the recipient of each review to file a response.  Plaintiff made several comments in response to her 2006 year-end review, including that (1) Plaintiff disagreed with the evaluation; (2) the evaluation had negatively affected Plaintiff's ability to obtain another position within the Bank; (3) the review inaccurately reported Plaintiff had failed to meet any of her goals, all of which Plaintiff had met, which was evidenced by the fact that the procedures Plaintiff prepared for her entire "team," in accordance with Plaintiff's EPM goals, had recently been used to train a colleague from the Bank's Chicago office; (4) the review failed to reflect that in addition to performing her own CRA Analyst job duties, Plaintiff also performed all the daily functions of Adams's Senior CRA Analyst position during Adams's 3 ½ month maternity leave, while, at the same time, training Walker; (5) the poor year-end evaluation was inconsistent with management's statements that Plaintiff had "really stepped up" and that Plaintiff's efforts would not "go unnoticed to senior management"; (6) the automation of the monthly State Report Card had not worked, requiring Plaintiff to make manual corrections and resulting in the reports being filed late; (7) Plaintiff could not fix the State Report Card program because Plaintiff is not a programmer; (8) the review failed to reflect Plaintiff's work for Deterville, which included being cross-trained for wire transfers, general ledger entries,

monthly account reconciliations, and proofs of the CDD's accounts; (9) Bartholomew had requested CDD employees direct any regulatory questions to Bartholomew, then criticized Plaintiff for failing to answer such questions despite the fact that Bartholomew never forwarded the questions to Plaintiff; (10) the evaluation indicated racism against Plaintiff which was further evident from comments Bartholomew made regarding dreaming of "black people," and that Bartholomew believed she was "black in a previous life"; (11) Bartholomew took issue with the fact that Plaintiff smokes cigarettes, telling Plaintiff had Bartholomew known Plaintiff smoked, Bartholomew never would have hired Plaintiff for as a CRA Analyst; (12) Bartholomew's response to Plaintiff's request for her final year-end review to permit Plaintiff to successfully post for another Bank position, was to state "in a demeaning tone 'well you will never get hired after they read my comments on your review'"; (13) Bartholomew had since become hostile toward Plaintiff, causing Plaintiff to have trouble sleeping and to suffer emotional distress; and (14) querying how it could be that, after 19 years of satisfactory job performance in her previous positions with the Bank, Plaintiff was not meeting job expectations and why that fact was not earlier brought to Plaintiff's attention.  Plaintiff's Exh.  X.

On February 16, 2007, Plaintiff e-mailed these comments to Manna who, in a telephone conversation with Bartholomew, made hand-written notations on Plaintiff's comments, memorializing Bartholomew's responses to some of Plaintiff's comments, including that (1) Plaintiff's mid-year overall performance rating of 4 was a warning to Plaintiff; (2) Plaintiff's failure to attempt to fix the automated State Report Card program, showed a lack of initiative; (3) CDD employees would send regulatory questions to

Bartholomew because they were concerned that Plaintiff was not thoroughly researching for the correct answers to their questions and Plaintiff's answers could not be trusted; (4) Bartholomew's comments to Plaintiff about smoking were intended as a joke, although Bartholomew did urge Plaintiff to quit; and (5) Bartholomew's statements about being black in a previous life and dreaming about black people were made during a discussion with Plaintiff, Adams, Walker, Deterville and Gadley about reincarnation. Plaintiff's Exh.  X.  Manna does not recall speaking with Plaintiff about Plaintiff's comments.

On February 22, 2007, Plaintiff forwarded to Manna eleven e-mails Plaintiff had received during 2006 from Bartholomew, Nissenbaum and Gadley complimenting Plaintiff for her job performance, and requested Manna attach the forwarded e-mails to Plaintiff's 2006 year-end review.  Later that same day, Manna contacted Plaintiff by telephone.  Manna did not question Plaintiff about her complaints but, rather, advised Plaintiff that if she truly felt as Plaintiff had described in her e-mail, that Plaintiff could leave her job that day.  Plaintiff's final day of work at the Bank was February 22, 2007.

On July 18, 2007, Plaintiff filed with the Equal Employment Opportunity Commission ("EEOC"), a charge of employment discrimination ("EEOC Charge").[24]  In its Verified Answer to the EEOC Charge ("EEOC Response")[25] the Bank submitted on August 9, 2007, the Bank stated that the decision to terminate Plaintiff was made by "Human Resources."  Charge Answer at 2 ("Human Resources had made the recommendation to have Complainant [Plaintiff] terminated . . . .").  The Bank relied on

---

[24] Plaintiff's Exh. C.

[25] Plaintiff's Exh. D.

the January 9 and 10, 2007 e-mails exchanged between Nissenbaum, Manna, Oaks, and Gawel in support of their assertion that the decision to terminate Plaintiff was made by the Bank's HR Department.

Bartholomew voluntarily resigned from the Bank in February 2008.  Bartholomew Declaration ¶ 2.  At the time of her resignation, Bartholomew still held her Vice President and Regulatory Reporting Manager position in the CDD.  *Id*.

On September 17, 2008, the EEOC issued its determination ("Right to Sue letter")[26] that, based upon its investigation, the EEOC was unable to conclude that Defendants had violated any statutes by terminating Plaintiff.  Plaintiff was also advised that she had ninety days from the receipt of the Right to Sue letter to commence legal action.  Plaintiff commenced the instant action on December 16, 2008.


## DISCUSSION

**1.    Summary Judgment**

Defendants move for summary judgment, arguing that the Bank has proffered a legitimate, non-discriminatory reason for Plaintiff's termination, *i.e.*, Plaintiff's poor job performance, which Plaintiff is unable to show was mere pretext for racial discrimination.  Defendants' Memorandum at 5-6.  According to Defendants, that the decisions to hire and terminate Plaintiff from the CRA Analyst position were made by Bartholomew who, like Plaintiff, is white, creates an inference in Defendants' favor against discrimination, Defendants' Memorandum at 6-8; Plaintiff is unable to show that

---

[26] A copy of the Right to Sue letter is attached as an exhibit to the Complaint.

she is similarly situated to Adams whose position was higher than Plaintiff's, *id.* at 8-9;

Walker's qualifications for the CRA Analyst position were superior to Plaintiff's given

that Walker possessed an Associate's degree and was working toward a Bachelor's

degree in Computer Information Systems, *id.* at 9-11; Plaintiff's 2006 job performance

was assessed at 4 compared to Walker and Adams, each of whom were assessed at 3,

*id.* at 11-14; that Bartholomew's remarks regarding African-Americans failed to support

a finding of discriminatory motivation because such comments are unrelated to any

decisional process, were only sporadic, *id.* at 14-21, and that although Bartholomew

failed to admonish Walker for his tardiness, Bartholomew also accommodated Plaintiff's

requests to leave work early for appointments and family obligations, which had

increased while Plaintiff worked for Bartholomew because Plaintiff was in the process of

a divorce and needed to take time to meet with her attorney and attend court

proceedings.  *Id*. at 21-22.

      In opposition to summary judgment, Plaintiff asserts that the evidence

establishes material issues of fact as to whether Defendants' purported non-

discriminatory reason for terminating Plaintiff was mere pretext for unlawful racial

discrimination.  Plaintiff's Memorandum at 6-22.  In particular, Plaintiff argues that a

discrepancy in the purported legitimate business reason given by Defendants in the

instant case, identifying Bartholomew as having made the decision to terminate

Plaintiff, as compared to the reason provided in the EEOC Charge Answer that the

decision to terminate Plaintiff was made by HR, is evidence of pretext.  *Id*. at 6-14.

Other evidence of pretext on which Plaintiff relies in opposition to summary judgment

include Plaintiff's 2006 mid-year and year-end reviews in which Plaintiff received overall

ratings of 4 and Adams and Walker were rated 3, *id.* at 14-19, and Bartholomew's comments regarding race. *Id*. at 19-22.

In further support of summary judgment, Defendants maintain that Plaintiff's argument regarding inconsistent reasons proffered by the Bank's EEO office and Defendants in this action is "based on a flagrant misreading of HSBC Bank's EEOC response and a selective presentation of evidence," and takes the Bank's EEOC Response out of context.  Defendant's Reply at 1-4.  Defendants further argue that certain inferences against discrimination recognized by the Second Circuit apply in this case, *id.* at 5-6, and that contrary to Plaintiff's assertions, the evidence fails to establish that Bartholomew's comments and actions were indicative of any racial preference. *Id*. at 6-10.

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322.  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting *Guilbert*

*v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)).  Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).


### 2.    Employment Discrimination

Title VII makes it "an unlawful employment practice" for an employer to discriminate against an employee because of the employee's "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1)).  Similarly, as relevant to this action, the NYHRL makes it unlawful for an employer to discriminate against an employee based on the individual's race.  N.Y. Exec. Law § 296.1(a).  The standard applied by the court to evaluate race discrimination claims under the NYHRL is parallel to the analysis used in evaluating Title VII claims.  *Cruz v. Coach Stores*, 202 F.3d 560, 565 n. 1 (2d Cir. 2000).

When a plaintiff alleges disparate treatment with regard to employment, liability depends on whether the protected trait, here, race, actually motivated the adverse employment decision.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000) (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)).  In the instant case, because Plaintiff alleges her employment with the Bank was terminated based on her race, Plaintiff must establish that her race "'actually played a role in [the employer's decisionmaking process] and had a determinative influence on the outcome.'" *Reeves*, 530 U.S. at 141 (quoting *Biggins*, 507 U.S. at 610) (bracketed

material in original).

Initially, the court addresses Defendants' reference to Plaintiff's "reverse discrimination claim" on the basis that Plaintiff, who is white, alleges Defendants chose to terminate Plaintiff's employment position, rather than the position held by Adams or Walker, both of whom are African-American.  Defendants' Memorandum at 1 ("This is a reverse employment discrimination case . . . ").  "Title VII of the Civil Rights Act of 1964 prohibits the discharge of 'any individual' because of 'such individual's race,' § 703(a)(1), 42 U.S.C. § 2000e-2(a)(1).  Its terms are not limited to discrimination against members of any particular race."  *McDonald v. Santa Fe Trail Trans. Co.*, 427 U.S. 273, 279 (1976) (reversing dismissal on the pleadings of Title VII employment discrimination action brought by two white plaintiffs who alleged they were discharged from their employment with a transportation company for misappropriating cargo from one of the company's shipments, but an African-American employee charged with the same offense was not discharged).  Accordingly, that Plaintiff is white and not a member of a minority group does not foreclose a finding of race-based employment discrimination.

### A.    Defendant HSBC USA

Defendants argue that Defendant HSBC USA is a bank holding company, owning 100% of the stock of Defendant Bank.  Defendants' Memorandum at 23; Oakes Declaration ¶ 3.  HSBC USA has no control over nor directs the labor and employee relations of the Bank.  Defendants' Memorandum at 23; Oakes Declaration ¶ 5.  As such, Plaintiff was employed by the Bank, but not by HSBC USA.  Defendants' Memorandum at 23; Oakes Declaration ¶ 4.  Accordingly, Defendants seek to have

HSBC USA dismissed as a Defendant to this action.  Defendants' Memorandum at 22-23.  Plaintiff has not argued in opposition to this request.

A plaintiff may seek relief for employment discrimination under both Title VII and New York's Human Rights Law only against an employer.  *Gulino v. New York State Educ. Dept.*, 460 F.3d 361, 370 (2d Cir. 2006) ("the existence of an employer-employee relationship is a primary element of Title VII claims."); *Herman v. Blockbuster Entertainment Group*, 18 F.Supp.2d 304, 313-14 (S.D.N.Y.1998) (considering whether defendant exercised sufficient control over plaintiff so as to be held liable as an employer under N.Y. HRL), *aff'd*, 182 F.3d 899 (2d Cir.), *cert. denied*, 528 U.S. 1020 (1999).  Not only has Plaintiff failed to even attempt to establish HSBC USA was her employer, but Plaintiff, in responding in opposition to summary judgment, refers to only the Bank as a defendant, thereby indicating Plaintiff concedes that she was employed by the Bank, but not be HSBC USA.  *See*, *e.g.*, Plaintiff's Memorandum at 1 ("Defendant HSBC Bank's motion for summary judgment should be denied . . . .").  Accordingly, Defendants' motion should be GRANTED with regard to the request that HSBC USA be dismissed as a defendant to this action.


### B.   Burden-Shifting Analysis

Claims of employment discrimination are subject to a burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-507 (1993).  The plaintiff bears the initial burden of establishing a *prima facie* case of unlawful discrimination, *id.*, and the plaintiff's initial burden is said to be "*de minimus*."  *Cronin v. Aetna Life Insurance Co.,* 46 F.3d 196,

202 (2d Cir. 1995).  Upon such a showing, the burden of going forward shifts to the employer, who must articulate some legitimate, non-discriminatory reason for the employee's termination or adverse employment action.  *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254 (1981); *Hicks*, 509 U.S. at 507.  "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves*, 530 U.S. at 142 (quoting *Hicks*, 509 U.S. at 509).  The ultimate burden of production then shifts back to the plaintiff to demonstrate "'that the proffered reason was not the true reason for the employment decision.'" *Hicks*, 509 U.S. at 508 (quoting *Burdine*, 450 U.S. at 256).  "An employer's reason for the termination [or adverse employment action] cannot be proven to be a pretext for discrimination unless it is shown to be false and that discrimination was the real reason." *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir.1995) (bracketed text added).  The burden of persuasion, however, at all times remains with the plaintiff on the issue of the true motivation for the discrimination. *Reeves*, 530 U.S. at 143; *Hicks*, 509 U.S. at 507; *Burdine*, 450 U.S. at 253.  Thus, to defeat a defendant's properly supported motion for summary judgment, the plaintiff must produce sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the employer were false, and that more likely than not the employee's race was the real reason for the discharge or adverse employment action.  *Holt v. KMI-Continental, Inc.,* 95 F.3d 123, 129 (2d Cir. 1996), *cert. denied*, 520 U.S. 1228 (1997).

### 1.    Prima Facie Case

To make out a *prima facie* case of employment discrimination under Title VII, a

plaintiff must show (1) membership in a protected class, (2) satisfactory job performance, (3) termination of employment or other adverse employment action, and (4) the ultimate filling of the position with an individual who is not a member of the protected class. *Farias v. Instructional Systems, Inc.*, 259 F.3d 91, 98 (2d Cir. 2001) (citing *Quaratino*, 71 F.3d at 64); *Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.), *cert. denied,* 474 U.S. 829 (1985).  In the instant case, however, Plaintiff does not allege that she was replaced by an employee of another race; rather, Plaintiff maintains her CRA Analyst position was selected for termination because Plaintiff is white, whereas Adams and Walker, both of whom were retained in their respective CRA Analyst positions, are African-America.  Nevertheless, "the fourth prong of the *prima facie* case may be satisfied if the plaintiff can demonstrate that the discharge or adverse employment action occurred under circumstances giving rise to an inference of discrimination on the basis of plaintiff's membership in that class."  *Farias*, 259 F.3d at 98(citing *McLee v. Chrysler Corp.*, 109 F.3d 134, 135 (2d Cir. 1997); and *James v. New York Racing Ass'n*, 233 F.3d 149, 153-54 (2d Cir.2000) (noting *prima facie* case is made out by showing membership in a protected class, qualification for the position, an adverse employment action and "preference for a person not of the protected class" (internal quotation marks and citation omitted))).

A plaintiff's burden to establish a *prima facie* case of employment discrimination to defeat summary judgment is *de minimus*, *McLee*, 109 F.3d at 134 (citing cases), and may be established based on either direct or circumstantial evidence.  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001) ("direct evidence of discriminatory intent [with regard to employment] is rare and such intent often must be

inferred from circumstantial evidence found in affidavits and depositions"); *Luciano v. Olsten Corp.*, 110 F.3d 210, 215 (2d Cir. 1997) ("Direct evidence is not necessary, and a plaintiff charging discrimination against an employer is usually constrained to rely on the cumulative weight of circumstantial evidence.").  Further, as the court may not resolve issues of fact on a summary judgment motion, its determination is limited to "whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive."  *McLee*, 109 F.3d at 135.

In the instant case, Defendants concede that Plaintiff has set forth a *prima facie* case of employment discrimination based on race.  Defendants' Memorandum at 5 ("For purposes of this motion, defendants do not contest that plaintiff can satisfy the requirements for a *prima facie* case.").  As such, the court turns to whether Defendants have demonstrated a legitimate, non-discriminatory reason for Plaintiff's termination.


### 2.    Legitimate, Non-Disriminatory Reasons for Adverse Action

In assessing whether the Bank has articulated a legitimate reason for selecting Plaintiff, rather than Adams or Walker, for termination, the court need not inquire as to whether Plaintiff, rather than Adams or Walker, was more qualified for the position; rather, so long as the proffered reasons are legitimate and nondiscriminatory, an employer is free to choose among qualified candidates without risking liability under Title VII.  *Burdine*, 450 U.S. at 259; *Meiri*, 759 F.2d at 995 (holding courts "must refrain from intruding into an employer's policy apparatus or second-guessing a business's decision-making process").  The law is well-established that federal courts hearing

discrimination claims do not "sit as a super-personnel department" to reexamine a firm's business decision about how to evaluate the relative merits of education and experience in filling job positions.  *Scaria v. Rubin*, 117 F.3d 652, 655 (2d Cir. 1997). Once the defendant employer introduces evidence of legitimate, nondiscriminatory reasons for the challenged adverse employment action sufficient to satisfy the defendant's burden of production, the presumption created by the Plaintiff's *prima facie* case is rebutted, and drops from the case.  *Reeves*, 509 U.S. at 143 (citing *Hicks*, 509 U.S. at 507-11).

In the instant case, Defendants maintain that the decision to eliminate Plaintiff's CRA Analyst position,[27] thereby terminating Plaintiff, instead of Adams or Walker, was based solely on Plaintiff's job performance which, in 2006 was rated as 4, *i.e.*, inconsistent job performance below expected level, and which was lower than the 3 which both Adams and Walker were rated, indicating job performance at expected levels.[28]  In support of this argument, Defendants have submitted copies of the 2006 mid-year and year-end reviews for Plaintiff, Adams, and Walker,[29] which establish that

---

[27] Plaintiff does not dispute that the transfer of some work from the CDD in Buffalo to Chicago resulted in a reduction-in-force by eliminating a CRA Analyst position, and no evidence in the record suggests the Bank ever hired another employee to fill Plaintiff's former CRA Analyst position.

[28] The court notes Defendants have not argued that Plaintiff's CRA Analyst position was selected for elimination because Plaintiff, who had more seniority than either Adams or Walker, was paid more, a fact not clear from the record, although suggested by Plaintiff's 19-years of employment at the Bank. Significantly, an employer is not prohibited making employment decisions, including the decision to terminate a particular position in a reduction-in-force situation, based on the employee's salary so long as the decision is based solely on financial considerations, and not on such factors as age, race, or gender. *See DiCola v. SwissRe Holding (North America), Inc.*, 996 F.3d 30, 32-33 (2d Cir. 1993) (holding reduction-in-force termination of 49-year old manager whose salary was higher than retained younger worker who took over discharged manager's job responsibilities did not constitute employment discrimination in violation of the Age Discrimination in Employment Act).

[29] Bartholomew did not prepare a 2006 mid-year performance evaluation for Walker who did not commence working as a CRA Analyst until July 10, 2006..

in 2006, at both mid-year and year-end, Plaintiff was rated at 4, Plaintiff's Exh.  U,

Adams was rated at 3, Plaintiff's Exh.  W, and Walker was rated at 3, Plaintiff's Exh. V.

An employee's work record can establish either that the employee's job performance

was unsatisfactory or that the employer's motive for an adverse employment action was

not discriminatory.  *McLee*, 109 F.3d at 135-37 (upholding district court's determination

that a discharged employee was unable to establish a *prima facie* case for racially

discriminatory discharge where the record indisputably showed the employee's job

performance was unsatisfactory in 12 out of 23 areas and that he had been disciplined

for repeated tardiness).  As such, Defendants have met their burden of establishing a

legitimate, non-discriminatory reason for Plaintiff's termination.

The burden of proof thus shifts back to Plaintiff to establish that Defendants'

proffered, legitimate reason for terminating Plaintiff, rather than Adams or Walker, was

mere pretext for race discrimination.

### 3.    Pretext

Once an employer articulates a non-discriminatory reason for the challenged

adverse employment action, "the presumption of discrimination 'drops out of the

picture,' . . . . [and] the employer will be entitled to summary judgment . . . unless the

plaintiff can point to evidence that reasonably supports a finding of prohibited

discrimination."  *James*, 233 F.3d at 154 (quoting *Hicks*, 509 U.S. at 510-11, and citing

*Burdine*, 450 U.S. at 255-56).  In other words, "the plaintiff - once the employer

produces sufficient evidence to support a nondiscriminatory explanation for its decision

- must be afforded the 'opportunity to prove by a preponderance of the evidence that

the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'"  *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 253).

Defendants' "motion for summary judgment may be defeated where 'a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.'"  *Byrnie v. Town of Cromwell, Bd. of Education*, 243 F.3d 93, (2d Cir. 2001) (citing *Reeves*, 530 U.S. at 143 ("the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'"  (quoting *Burdine*, 450 U.S. at 255, n.  10))).  The creation of a genuine issue of fact as to pretext is not, without more, sufficient to rebut a defendant's legitimate non-discriminatory reason; rather, "[t]here must also be evidence that would permit a rational factfinder to infer that the discharge was actually motivated, in whole or in part, by discrimination on the basis of [the protected trait]."  *Grady v. Affiliated Central, Inc.*, 130 F.3d 553, 561 (2d Cir. 1997). Nevertheless, the plaintiff's failure to produce "any evidence, other than conclusory statements unsupported by the record, to rebut the legitimate, nondiscriminatory reasons offered by [the employer for the adverse employment action], let alone evidence that could reasonably support a verdict in [plaintiff's] favor," warrants dismissal on summary judgment.  *Farias*, 259 F.3d at 99.  In this case, Plaintiff has made a substantial showing of circumstantial evidence from which, taken together, a reasonable jury could conclude that Defendants' proffered legitimate, non-discriminatory reason for terminating Plaintiff, instead of Adams or Walker, was false

35

and, thus, a pretext for Bartholomew's race-based employment discrimination.

First, Defendants argue that the fact that both decisions to hire and terminate Plaintiff from the CRA Analyst position were made by Bartholomew who, like Plaintiff, is white, creates an inference in Defendants' favor against discrimination.  Defendants' Memorandum at 6-8.  The Second Circuit recognizes that "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.  This is especially true when the firing has occurred only a short time after the hiring."  *Grady*, 130 F.3d at 560 (citing cases).  As such, Defendants maintain that because both the decisions to hire and terminate Plaintiff were made by Bartholomew, and both decisions occurred within less than two years, "the same actor inference applies in favor of the defendants and greatly weakens plaintiff's claim."  Defendants' Memorandum at 7.

In opposition, Plaintiff argues that Defendants' reliance on generic inferences, including that both Plaintiff and Bartholomew are Caucasian, and that Bartholomew made both decisions to hire, as well as to fire, Plaintiff, within a period of less than two years, are insufficient to overcoming the evidence of pretext on which Plaintiff relies.  Plaintiff's Memorandum at 10-11.  In particular, Plaintiff urges the court to reject the "same actor inference" where, as here, evidence in the record establishes questions of fact as to whether Bartholomew made the decision to hire Plaintiff, or whether Nissenbaum was involved in the decision to hire Plaintiff in the CDD.  *Id*.  In further support of summary judgment, Defendants maintain that even if Nissenbaum participated in the decision to hire Plaintiff, such fact does not negate the fact that

Bartholomew was involved in both the hiring and termination decisions, and that the evidence, as presented by Plaintiff, established Nissenbaum was involved in the decision to terminate Plaintiff, thereby established that both Bartholomew and Nissenbaum were involved in both decisions.  Defendants' Reply Memorandum at 5-6. Based on the record, however, a reasonable jury could find that Nissenbaum, as well as others in the review process, acquiesced in Bartholomew's decision and that Bartholomew was, in fact, the person who, for reasons of racial prejudice, terminated Plaintiff.

Plaintiff has established an issue of fact exists as to whether Bartholomew or Nissenbaum made the decision to hire Plaintiff as a CRA Analyst in the CDD.  *See* Bartholomew Dep. Tr. at 45-46 (Bartholomew admitting she could not recall whether Nissenbaum interviewed Plaintiff but that if Nissenbaum had interviewed Plaintiff, Nissenbaum would have been involved in the decision to hire Plaintiff because Nissenbaum "was very much a hands on manager."); Riley Declaration ¶ 13 (stating Plaintiff interviewed with Nissenbaum and was offered the CRA Analyst position by "someone in Human Resources.").  Moreover, "the assessment of credibility and the drawing of inferences adverse to the nonmoving party is not within the province of the court in deciding a motion for summary judgment."  *Grady*, 130 F.3d at 560.  As such, even assuming, *arguendo*, that Bartholomew decided both the hire Plaintiff in May 2005, and to terminate Plaintiff in January 2007, the court is precluded from drawing from such facts an inference of non-discrimination against Plaintiff.  *Id*. at 561.

Defendants next argue in support of summary judgment that Plaintiff is unable to show that she is similarly situated to Adams whose position was higher than Plaintiff's

and, thus, cannot establish disparate treatment by comparing how Defendants treated

Plaintiff and Adams.  Defendants' Memorandum at 8-9.  In opposition, Plaintiff argues

that employees need not hold the same position to be considered "similarly situated."

Plaintiff's Memorandum at 12-13.  Plaintiff also maintains the evidence establishes

Defendant considered Plaintiff similarly situated to both Adams and Walker. *Id*.  at 13-

14.  In further support of summary judgment, Defendants assert that the evidence

conclusively establishes Plaintiff was terminated based on poor job performance.

Defendants' Reply at 6-8.

Evidence in the record establishes that Adams's Senior CRA Analyst position,

although similar, was higher than Plaintiff's CRA Analyst position, with the Senior CRA

Analyst having a more technical nature and responsible for computer programming,

trouble-shooting and maintaining the CRA-Wiz computer program application used by

the CDD.  Bartholomew Declaration ¶¶ 10, 12; Bartholomew Dep. Tr. at 51; CRA

Analyst Job Description (Bartholomew Declaration Exh. A); Senior CRA Analyst Job

Description (Bartholomew Declaration Exh. B).  This fact is undisputed.

The Second Circuit has recognized that "employees need not be of the exact

same rank to be considered 'similarly situated.'" *Gorzynski v. Jetblue Airways Corp*.,

596 F.3d 93, 109 n. 7 (2d Cir.  2010) (citing *Hargett v. Nat'l Westminster Bank*, 78 F.3d

836, 839 (2d Cir.  1996)).  In *Hargett*, an employment discrimination action in which the

African-American plaintiff alleged he was more severely disciplined than two white

employees who engaged in the same behavior, the Second Circuit held that the fact

that the two white employees held positions lower in the corporate hierarchy than the

plaintiff did not preclude a finding that the similar acts committed by employees holding

different levels of authority within the company were of comparable seriousness, requiring similar discipline.  *Hargett*, 78 F.3d at 839-40.  Further, an employer's treatment of workers outside the plaintiff's protected class "is relevant evidence about the employer's attitude about [the protected trait]."  *Gorzynski*, 596 F.3d at 109 n.  7.

Here, evidence in the record establishes that Adams was considered one of the three employees for reduction-in-force termination based on the decision to transfer some of the CDD work from Buffalo to Chicago.  *See* Bartholomew Dep. Tr. at 122-23 (Bartholomew explaining she was aware of the possibility that the shift of some CDD functions from Buffalo to Chicago would result in the loss of a staff position in the Buffalo CDD; *id.* at 128 (Bartholomew describing conversation with Nissenbaum discussing that there were three people from whom to select the position to terminate, including Plaintiff, Walker and Adams).  In his January 9, 2007 to Gawel, Manna explained that the Buffalo CDD was losing one of its positions to the Chicago CDD, and identified three positions that were subject to termination, including the CRA Analyst positions held by Plaintiff, Walker, and Adams, and requested an adverse impact report be prepared to assist in assessing which of the three positions to eliminate.[30]  Plaintiff's Exh. F.  That Plaintiff, Walker, and Adams were cross-trained and able to perform most of the functions of each others' jobs is further evidence of the similarity between the CRA Analyst and the Senior CRA Analyst positions.  As such, that Plaintiff's CRA Analyst position was not exactly the same as Adams's Senior CRA Analyst position is not dispositive of whether Plaintiff and Adams were, for purposes of Plaintiff's

---

[30] The court notes that the adverse impact report has not been made part of the record.

employment discrimination claim, similarly situated.

Defendants also maintain that because Walker's qualifications for the CRA Analyst position were superior to Plaintiff's given that Walker possessed an Associate's degree, and was working toward a Bachelor's degree, in Computer Information Systems which Walker received in 2008, Plaintiff cannot establish that any reasonable person would have chosen to retain Plaintiff, rather than Walker.  Defendants' Memorandum at 9-11.  The undisputed evidence establishes that Walker, when hired for his CRA Analyst position, held an Associate's degree in Computer Information Systems, and was pursuing a Bachelor's degree in the same field, which Walker received in the Spring of 2008.  Walker Dep. Tr. at 16-17.  Plaintiff, however, has never argued that she possessed skills and qualifications superior to Walker; rather, Plaintiff has alleged, and Defendants have not disputed, she was qualified for, and satisfactorily performed the CRA Analyst position from which she was terminated, while Walker remained on the job.

Moreover, the case on which Defendants rely for the proposition that "a plaintiff seeking to avoid summary judgment on the basis of a discrepancy in qualifications" must establish that her qualifications or abilities were superior to those of the retained employee's, *Byrnie v. Town of Cromwell, Board of Education*, 243 F.3d 93, (2d Cir. 2001), is inapposite.  Specifically, although in *Byrnie*, the Second Circuit did state that "[w]here a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask the unlawful discrimination," *Byrnie*,

243 F.3d at 103, the Court of Appeals continued that although the discrepancy between the plaintiff and the chosen job candidate's qualifications "does not on its own have the strength to create a material issue of fact, that does not mean the discrepancy is stripped of all probative value."  *Id*.  Significantly, the Court of Appeals reversed the district court's grant of summary judgment, holding other evidence in the record was sufficient to allow a reasonable jury to conclude that the legitimate business reason articulated for hiring another job candidate over the plaintiff was pretext.  *Id*. at 106-07. Accordingly, this argument put forth by Defendants is not dispositive of whether summary judgment is warranted.

Nor is Defendants' argument, Defendants' Memorandum at 11-14, that Plaintiff's 2006 job performance was assessed at 4 compared to Walker and Adams, each of whom were assessed at 3, and that Plaintiff, in response to her 2006 mid-year review, agreed with several of the criticisms regarding Plaintiff's work, dispositive of Plaintiff's employment discrimination claims.  Rather, a plethora of circumstantial evidence in the record establishes issues of fact as to whether Bartholomew manipulated the 2006 year-end ratings so as to justify terminating Plaintiff, rather than Adams or Walker, based on racial preference.

In particular, in his January 2, 2007 e-mail, Nissenbaum requested Bartholomew reference specific incidents of Plaintiff's poor job performance to justify an undisclosed "lower rating" for Plaintiff.  January 2, 2007 Nissenbaum e-mail.  Bartholomew responded by sending Nissenbaum a new draft of Plaintiff's 2006 year-end job performance containing numerous criticisms regarding Plaintiff's failure to take initiative in various areas, including CRA-Wiz programming and troubleshooting, Bartholomew

Reply Declaration Exh. C, which required computer skills Plaintiff admittedly did not possess.  Although the record does not contain any reply from Nissenbaum to the January 3, 2007 re-draft, Bartholomew nevertheless, in her January 5, 2007 e-mail, found it necessary to advise Nissenbaum that because both Plaintiff and Walker had the same job description and job responsibilities, giving both Plaintiff and Walker the same 2006 year-end overall job performance rating could pose a problem if the decision were made to terminate Plaintiff given that Plaintiff had more experience and had worked in the CRA Analyst position longer than Walker.  That Bartholomew further urges Nissenbaum not to change Plaintiff's 2006 year-end overall job performance rating from 4 to 3, stating "we need to give this more thought before you decide to have me change her [Plaintiff's] rating from 4 to 3.  We can justify keeping Joe [Walker] instead of her [Plaintiff] if she isn't doing the job, but we can't rate then the same for the same job.  I think you are wise to speak with [AVP HR Generalist] Anthony Manna about it first," January 5, 2007 Bartholomew e-mail, strongly suggests Nissenbaum still had reservations about rating Plaintiff as low as 4.

The combination of the January 5, 2007 Bartholomew e-mail, along with the series of e-mails exchanged on January 9 and 10, 2007, between Nissenbaum, Manna, Oaks, and Gawel, seeking reassurance that Plaintiff's termination would not raise any employment discrimination issues based on race, age, or gender, begs the question - if Plaintiff were, in fact, such a poor performer, why did Defendants' managers raise concerns about legal action if Plaintiff were terminated.[31]  It is significant that Manna

---

[31] Absent from Defendants' papers is any explanation as to how Defendants would have handled the RIF termination if Gawel's response to the e-mails advised against selecting Plaintiff.

admitted had he known about the January 5, 2007 Bartholomew e-mail when Gawel inquired as to whether there would be any "issues" with terminating Plaintiff, rather than Adams or Walker, Manna would have been concerned.  Manna Dep. Tr. at 135.

Nor is Bartholomew's statement that "[i]f Dawn [Plaintiff] is truly performing at a "meets expectations" level, (*which she is not*,) she has a legitimate argument/case that Joe [Walker] should be the one to go if we have to lose a req." January 5, 2007 Bartholomew e-mail (italics and bracketed material added), conclusive proof that Plaintiff's job performance had fallen to an unacceptable level.  Rather, the circumstances surrounding the statement calls into question Bartholomew's credibility and suggests Bartholomew is attempting to persuade Nissenbaum to acquiesce in Bartholomew's decision that the CRA Position held by Plaintiff should be eliminated, and that Plaintiff's 2006 job performance ratings of 3 were not accurate.  *In re Dana Corp.*, 574 F.3d 129, 151-52 (2d Cir. 2009) (vacating grant of summary judgment where district court improperly made credibility determination which is function of the jury and may not be determined on summary judgment).  *See Cornwell v. Robinson*, 23 F.3d 694, 706-07 (2d Cir. 1994) (holding question of witness's credibility in Title VII employment discrimination action can be circumstantial evidence of discrimination, discriminatory intent, and causation, all findings of fact for the jury which must be upheld absent clear error).

Specifically, prior to her 2006 mid-year performance review, Plaintiff had never received an overall rating worse than 3.  Despite Nissenbaum's instruction to Bartholomew on August 22, 2006, Bartholomew never amended Plaintiff's 2006 EDM to reflect the additional duties Plaintiff assumed under Deterville in August 2006.  On the

2006 year-end evaluations, Bartholomew gave Plaintiff an overall rating of 4, arrived at after conferring with Nissenbaum and with awareness that such rating would be used to justify Plaintiff's termination, and gave Walker and Adams overall ratings of 3, assuring their retention.  Plaintiff's year-end review contains comments by Bartholomew criticizing Plaintiff for filing monthly State Report Cards late, although Adams's year-end review does not reflect the problems Adams experienced in attempting to automate the State Report Card process which was Adams's responsibility.  In preparing Plaintiff's year-end assessment, Bartholomew failed to report the additional work Plaintiff performed while Adams was on maternity leave, training Walker, and working for Deterville.  Although Bartholomew admitted that Plaintiff "did the bulk of the training" of Walker, Bartholomew Dep. Tr. at 88, there is no mention of such training on Plaintiff's 2006 year-end assessment 's year-end review, whereas Bartholomew noted on Adams's 2006 year-end review that "Letitia has worked closely with Joe Walker, our newest Jr. Analyst, by providing technical assistance and guidance on a regular basis." Bartholomew Dep. Tr. at 88; Plaintiff's Exh. W.

Plaintiff also alleges, and Defendants have not disputed, that Plaintiff was criticized for work errors, including problems with automating the State Report Card by programming the CRA-Wiz application, although Plaintiff's CRA Analyst position did not list programming or automating reports among the job duties, whereas Adams, who was responsible for programming CRA-Wiz, including automating the State Report Card, was not criticized when the automation repeatedly failed.  *See* Riley Declaration ¶¶ 36-37.  Adams's 2006 year-end review states that

Letitia automated the monthly CRA State Report Card.  Prior to the automation

of this process, the data was manually input into an excel [*sic*] spreadsheet on a monthly basis.  The automation of this process has resulted in significant time savings and better overall data integrity.

Plaintiff's Exh.  W.

Defendants do not dispute Plaintiff's assertion that Adams's failure to properly automate the State Report Card required Plaintiff to make manual adjustments to the State Report Card, resulting in the report being filed late, for which Bartholomew criticized only Plaintiff, and never Adams.  Riley Declaration ¶ 38.  Further, Bartholomew was unable to explain why only Plaintiff was criticized for the late filing of the State Report Cards, when evidence in the record implies that the late filings occurred as a result of Adams's repeated failure to properly automate the report, such that Plaintiff was required to manually correct errors in the report.  *See* Bartholomew Dep.  Tr.  at 136-37.

In response to deposition questioning, Bartholomew testified that Bartholomew failed to amend Plaintiff's EPM for 2006 to reflect that 20% of Plaintiff's work was performed for Deterville.[32]  Bartholomew Dep. Tr. at 121-21.  Nor is there any evidence in the record that Deterville was ever consulted or asked to provide any assessment of the quality of the work Plaintiff performed for Deterville.  This circumstantial evidence establishes an issue of fact as to whether Plaintiff's job performance in 2006 actually justified the 4 job performance rating she received, or was a pretext for Bartholomew's decision to eliminate Plaintiff's position because of Bartholomew's preference for

---

[32] It is curious why, if Plaintiff were routinely faulted for her lack of attention to detail and typographical errors, Plaintiff would have been assigned to perform work for Deterville requiring attention to detail and accuracy, including wire transfers, general ledger entries, monthly account reconciliations, and proofs of the CDD's accounts.

45

Adams and Walker based on their race.

Defendants argue that Plaintiff cannot rely on Bartholomew's remarks regarding African-Americans to support a finding of discriminatory motivation because such comments are unrelated to any decisional process, were only sporadic, and are too stray.  Defendants' Memorandum at 14-21.  Such statements include (1) Bartholomew's announcement at a meeting with other CDD employees, including Plaintiff, Adams, Walker, Deterville, and Gadley, in December 2006, that Bartholomew believed she was a "black person" in a previous life, "dreams about black people," and "loves black music," Riley Declaration ¶ 40; and Bartholomew Dep. Tr. at 220-23), (2) statements both prior to and after Adams's maternity leave that Bartholomew wanted to be Adams's baby's "white grandmother," Riley Declaration ¶ 43; Bartholomew Dep. Tr. at 228, (3) another occasion[33] in which Walker and Plaintiff were talking at Plaintiff's cubicle about Walker's church, and Bartholomew joined them and stated she would like to attend Walker's church with him and, when Walker responded that most of the congregation "did not look like Linda Bartholomew," Bartholomew replied that she wanted to go even though she is "white,"[34]  Riley Declaration ¶ 44; and (4) repeatedly complimenting Walker regarding his dress and appearance.  *Id*. ¶ 35.  Plaintiff argues in opposition that Defendants rely on their characterization of such remarks as "stray," and, given that the remarks were not made in connection with any job performance

---

[33] Although the record does not indicate when this discussion took place, that Walker commenced working in the CDD on July 10, 2006, and Plaintiff's last day working at the Bank was February 22, 2007, strongly implies the conversation occurred during that period of time.

[34] Nothing in the record indicate whether Bartholomew admits or denies making the statements regarding wanting to attend Walker's church.

matter, are not offensive.  Plaintiff's Memorandum at 19-22.  Defendants have not argued on this point in further support of summary judgment.

In support of this argument, Defendants cite several cases holding that stray remarks do no constitute sufficient evidence of racial preference in an employment discrimination action.  Defendants' Memorandum at 15 (citing, *inter alia*, *Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 56 (2d Cir. 1998) ("stray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination."  (citing *Woroski v. Nashua Corp.*, 31 F.3d 105, 109-10 (2d Cir. 1994)).  Defendants' reference to *Danzer*, 151 F.3d at 56, is, however, taken out of context.  In fact, in the very next line following the quoted material, the Second Circuit explains that "all that *Woroski* holds is that such comments, *without more*, cannot get a discrimination suit to a jury."  *Danzer*, 151 F.3d at 56 (italics in original).  This is consistent with the Second Circuit's more recent explication that "[t]he relevance of discrimination-related remarks does not depend on their offensiveness, but rather on their tendency to show that the decision-maker was motivated by assumptions <u>or attitudes</u> relating to the protected class.  Inoffensive remarks may strongly suggest that discrimination motivated a particular employment action."  *Tomassi v. Insignia Financial Group, Inc.*, 478 F.3d 111, 116 (2d Cir. 2007) (holding although stray age-related remarks were not, offensive, such remarks "had a strong tendency in the circumstances" surrounding the age-based employment discrimination plaintiff's discharge to show that the plaintiff's supervisor believed that the plaintiff's age rendered the plaintiff's ill-suited for the job) (underlining added).  *See also Stewart v. Peat, Marwick, Mitchell & Co.*, 1989 WL 34037, * 8 (S.D.N.Y. Apr. 4, 1989) ("A statement by

an employer showing his animus toward members of a particular race is a common way of proving that race made a difference in the employer's employment decision."). Similarly, in the instant action, Bartholomew's race-related remarks, although arguably stray, were not, by themselves, offensive to Plaintiff[35] yet, under the circumstances presented by the evidence in the record, a reasonable jury could find the remarks tend to show Bartholomew had a preference for African-American employees, as compared to white employees.  While Bartholomew insisted that her concededly race-preferential comments were "jokingly" made, Bartholomew Dep. Tr. at 220-23, coming as they did within the six-month period leading to Plaintiff's termination, on this record, a reasonable jury could find the remarks revealed a consistently strong personal bias to favor black employees over whom she held supervisory authority.

Defendants further assert that although Bartholomew failed to admonish Walker for his tardiness, Bartholomew also accommodated Plaintiff's requests to leave work early for appointments and family obligations, which had increased while Plaintiff worked for Bartholomew because Plaintiff was in the process of a divorce and needed to take time to meet with her attorney and attend court proceedings.  Defendants' Memorandum at 21-22.  Although Plaintiff has not directly disputed this assertion, Plaintiff maintains that she always offered to use her accrued personal leave time to attend appointments related to her then-pending divorce proceedings and other family obligations, but that it was up to each employee's manager's discretion whether an

---

[35] Bartholomew's statement to Adams about wanting to be Adams's baby's "white grandmother" is particularly odd given that Bartholomew admitted that Adams had been disrespectful to Bartholomew, which was a reason Bartholomew issued Adams an IJD in 2005, yet performed the technical aspects of her Senior CRA Analyst position very well, raising the question whether Bartholomew did, in fact, attempt to curry Adams's favor by appearing more favorable to African-Americans.

employee should use such leave and that Bartholomew never required a subordinate, including Plaintiff, to use personal leave time to attend to family obligations.  Plaintiff Dep. Tr. at 65-67.  Defendants do not challenge Plaintiff's explanation, nor do Defendants assert that Walker was tardy because of family obligations.[36]  As such, Bartholomew's failure to admonish Walker's tardiness, if such tardiness occurred, is more circumstantial evidence of possible racial preference.

Further circumstantial evidence of racial preference is that Bartholomew had tacked to her cubicle's walls photographs of Bartholomew posing with Walker, and with another African-American employee, Abrams.  Although displaying the photos, without more, would be insufficient to support a claim of race-based employment discrimination, the pictures may be considered by the jury along with the plethora of other circumstantial evidence of discrimination.

Bartholomew gave deposition testimony that prior to going on maternity leave, Adams spent much time training Walker, who had just been hired in the CDD. Bartholomew Dep. Tr. at 84-85.  In contrast, other evidence in the record establishes that Adams went on maternity leave on June 29, 2006, but that Walker did not commence his CRA Analyst position in the CDD until July 10, 2006.  June 29, 2006 Bartholomew e-mail.  When confronted with the information regarding her e-mail, Bartholomew was not able to explain the discrepancy between her deposition statement that Adams trained Walker prior to her maternity leave, and the June 29, 2006 Bartholomew e-mail indicated Walker did not commence working in the CDD until July

---

[36] Defendants do not deny that Walker was consistently tardy, but assert that Plaintiff has failed to present any competent evidence establishing Walker's alleged tardiness.  Defendants' Reply Memorandum at 10, n. 3.

10, 2006, after Adams left for maternity, thus supporting Plaintiff's contention that she, not Adams, trained Walker.  *See* Bartholomew Dep. Tr. at 86-88 (Bartholomew acknowledging sending an e-mail on June 29, 2006 advising that Adams commenced her maternity leave that day and was expected to return to work in "mid-October," that in Adams's absence all requests were to be directed to Bartholomew, with copies to Plaintiff, and that Walker would be "joining us on July 10th . . . .").  Bartholomew's inability to explain this apparent inconsistency further calls into question Bartholomew's credibility.

Plaintiff also maintains that a discrepancy between the purported business reason for terminating Plaintiff's CRA Analyst position given by the Bank's HR Department in responding the Plaintiff's EEOC Charge, as compared to the reasons Defendants assert in connection with the instant motion establish that one of the reasons was false.  Plaintiff's Memorandum at 6-9.  Arguing in further support of summary judgment, Defendants maintain that they have not presented inconsistent statements about why it terminated Plaintiff.  Defendants' Reply Memorandum at 1-4.

According to Plaintiff, the EEOC Response asserts that the decision to terminate Plaintiff was made by the Bank's HR Department after obtaining an adverse impact report from the Bank's EEO Compliance Department.  Plaintiff's Memorandum at 6-7.  Attached to the EEOC Response is the series of e-mails exchanged on January 9 and 10, 2007, between Nissenbaum, Manna, Oaks, and Gawel discussing whether Plaintiff's termination would raise any employment discrimination issues, with Manna advising Gawel that the work transfer would result in the elimination in Buffalo of one of the CRA Analysts positions held by Plaintiff, Adams, and Walker, all of whom reported

to Bartholomew, that the CDD had identified Plaintiff's position as the one to be eliminated because of Plaintiff's 2006 mid-year and year-end job performance ratings of 4, but stating Manna "just wanted to make sure that there were no issues with this prior to moving forward with the RIF."  Plaintiffs' Exh.  E.  Gawel responded with an e-mail to Oaks requesting an adverse impact report ("AI") of the proposed termination of Plaintiff, and Oaks responded by e-mail the next day. *Id*.   Gawel, by e-mail to Manna on January 10, 2007, to which a copy of the AI generated by Oaks was attached, advised "[b]ased on the information provided in this email, there are no race, age or gender issues for Dawn Riley, assuming her position is being eliminated due to a reduction in force and will not be replaced."  *Id*.  Plaintiff maintains that Defendants relied on these e-mails to support their assertion that the decision to terminate Plaintiff was made by HR based on Plaintiff's 2006 job performance ratings of 4.  Plaintiff's Memorandum at 7.

In contrast, evidence Plaintiff obtained through discovery establishes that Bartholomew made the decision to terminate Plaintiff, and then manipulated Plaintiff's 2006 year-end review, including Plaintiff's job performance rating, to justify the decision. *Id*.  at 7.  Such evidence includes the January 5, 2007 Bartholomew e-mail in which Bartholomew advises Nissenbaum that unless Plaintiff receives a 2006 year-end job performance rating lower than Walker, it will be difficult to justify terminating Plaintiff, rather than Walker, given that Plaintiff and Walker have the same job description and Plaintiff had more experience as a CRA Analyst, and more time at the Bank.  *Id*. at 7-8. As such, Plaintiff asserts that Defendants can no longer argue the decision to terminate Plaintiff was made by a neutral person in HR assessing year-end reviews.  *Id*. at 8.

In further support of summary judgment, Defendants argue that Plaintiff presents only selected portions of the Bank's EEOC Response out of context.  Defendants' Reply at 1-2.  According to Defendants, HSBC North America Vice President, Equal Employment Opportunity and Affirmative Action Kelly Ann Hebeler ("Hebeler"), explains that nowhere within the Bank's EEOC Response is there any reference to anyone in HR or the EEO Department making the decision to terminate Plaintiff.  Defendant's Reply at 2 (citing Hebeler Declaration at 1-3).  As such, Defendants urge the court to find Plaintiff's argument regarding inconsistent reasons without merit. *Id*.  at 2-4.

Discrepancies between the reason a defendant provides in response to an EEOC discrimination charge, as compared to the reason asserted in employment discrimination litigation action can support a reasonable jury's inference that one of the answers was false and, thus, a pretext for discrimination.  *E.E.O.C. v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994) (allowing employment discrimination case to go to jury where EEOC introduced evidence suggesting employer gave inconsistent explanations for terminating employee from which reasonable juror could infer explanations given at trial were pretextual).  Here, a plain reading of the Bank's EEOC Response establishes that upon being notified in January 2007, that Buffalo's CDD was losing a position to Chicago's CDD, "Human Resources contacted EEO Compliance to run an adverse impact report."  EEOC Response at 2.  "Based on the fact that Complainant was the weakest performer, she was the one chosen to be released due to the reduction in force." *Id*.  On January 18, 2007, Plaintiff met with Nissenbaum who advised that her position was being eliminated; Bartholomew witnessed the meeting.  *Id*.  The EEOC Response continues that "*Human Resources had made the recommendation* to have

Complainant terminated on that date, but Complainant's managers decided to keep her through the end of February, to give her ample time to post for other positions in the bank if she so desired." *Id*. (italics added).

At best, the EEOC Response raises a question as to whether HR or Bartholomew made the actual decision to terminate Plaintiff, rather than Adams or Walker.  Further,  the EEOC Response's statement that Plaintiff's managers decided to allow Plaintiff to remain in her CRA Analyst position through February "to give her ample time to post for other positions in the bank if she so desired," EEOC Response at 3, is inconsistent with the fact that Plaintiff did not receive her 2006 year-end job performance review until February 15, 2007, which included negative comments that were unlikely to assist Plaintiff in obtaining another position.  Such inconsistencies are further circumstantial evidence of pretext for discrimination.

Plaintiff has also submitted copies of eleven e-mails Plaintiff received between February 8 and December 1, 2006, from other CDD employees, including Bartholomew, Nissenbaum, and Gadley, complimenting Plaintiff for her work in the CDD.  Plaintiff's Exh. Q.  For example, in an e-mail dated September 26, 2006, Gadley advised Bartholomew that "I want you to know how much I appreciated Dawn [Plaintiff] and Joe's assistance during the CRA preparation period.  They have been eager to address my inquiries and assist with technical support." *Id*.  Bartholomew, in an e-mail dated September 28, 2006, responded "Thank you for the feedback.  I am very glad that my team was so helpful to you.  Dawn [Plaintiff] and Joe, a special thank you to the [*sic*] both of you.  Your hard work and team spirit is making me very proud to have you up to

the plate when we are short staffed . . . nice work."[37]  *Id*.  (ellipses in original).  In an e-mail dated October 12, 2006, Bartholomew comments on a report prepared by Plaintiff with "This is great Dawn!  Thank you!"  *Id*.  In another e-mail dated December 1, 2006, Bartholomew requested, *inter alia*, Plaintiff to update a particular spreadsheet, and concludes with "Thanks all, as always nice work!"  *Id*.  The inconsistency between the fact that several of these e-mails were prepared by Bartholomew after rating Plaintiff a 4 on her 2006 mid-year performance evaluation, and shortly before Plaintiff was terminated, is apparent and is further circumstantial evidence of pretext.

Of further curiosity is the fact that although in 2005, Adams was issued an IJD because of her "very bad" and "belligerent" attitude, Bartholomew Dep. Tr. at 57, which caused Bartholomew to rate Adams only 4 for 2005, *id.*, Adams's year-end review contained no negative comments, and Bartholomew, in 2006, arranged for Adams to be retroactively awarded a bonus for 2005, despite admitting that Adams's overall 4 rating rendered Adams ineligible for a bonus.  *Id*. at 107-08.  Despite Bartholomew's deposition testimony that in early 2006, Adams's attitude improved, and the decision was made to "take her off the IJD and we gave her a bonus," that was retroactive to 2005, Bartholomew Dep. Tr. at 108, Bartholomew did not explain that Adams's 2005 year-end overall job performance rating was changed from 4, which would have rendered Adams ineligible to receive a bonus, to 3, which would have permitted a bonus, nor is there any evidence in the record that the Bank's personnel policy permitted such a change.  Such manipulation of the Bank's alleged EPM system could

---

[37] Adams was on maternity leave at this time.

cause a reasonable jury to doubt the objectivity of the EPMs given out by Bartholomew, finding that Plaintiff's 2006 year-end review was a rationalization or pretext for Bartholomew's perceived intent to preserve Adams's and Walker's positions because of Bartholomew's preference of their retention based on their race.

Finally, although not specifically argued by Plaintiff, a plain reading of the record establishes that by the time of Plaintiff's termination from the Bank, the racial makeup of the five CDD employees who reported to Bartholomew had significantly changed.  In particular, when Plaintiff commenced working in the CDD in May 2005, she replaced Liermo, who was white.  Adams was hired in August 2005 to replace Russo, who was also white.  Walker was hired in July 2006.[38]  Both Gadley, who is African-American, and Deterville, who is white, continued to work for Bartholomew in the CDD before Plaintiff was hired for the CDD position, and after Plaintiff was terminated.  As such, when Plaintiff commenced working in the CDD, of the five employees Bartholomew supervised, four were white, and one was African-American.  In contrast, upon Plaintiff's termination in February 2007, there was a net increase of two African-American employees and a net decrease of three Caucasian employees in the CDD, such that of the four remaining employees supervised by Bartholomew after Plaintiff's termination, three were African-American, and one was white.  Again, while this fact alone would be insufficient to support Plaintiff's race-based employment discrimination

---

[38] Given that Walker was hired in July 2006, precisely when Bartholomew learned in 2006, that the Buffalo CDD may lose a position in 2007, *see* Bartholomew Dep. Tr. at 92-93 (Bartholomew admitting that she "probably" knew "months" before the final decision was made to shift work from Buffalo to Chicago, that one position in the Buffalo CDD would be lost), could be circumstantial evidence as to whether Bartholomew understood that the hiring Walker would allow for the termination of Plaintiff on the basis of a reduction-in-force despite Plaintiff's prior satisfactory performance, and that the quality of Walker's future performance was then unknown.

claim, it is additional circumstantial evidence that Bartholomew preferred workers who were African-American over those who were Caucasian.

In short, the record contains a plethora of circumstantial evidence on which a reasonable jury could infer Defendants' proffered legitimate, non-discriminatory reason – Plaintiff's supposed weak job performance – given for terminating Plaintiff was mere pretext for discriminating against Plaintiff based on her race.  As such, Defendants' motion seeking summary judgment should be DENIED as to the Bank.


## **CONCLUSION**

Based on the foregoing, Defendants' motion for summary judgment (Doc. No. 26), should be GRANTED in part, with regard to the request that HSBC USA be dismissed as a defendant to the action, but otherwise DENIED as to the Bank.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:        February 3, 2011
              Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an**

**extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:        February 3, 2011
             Buffalo, New York