UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DAWN RILEY,

                 Plaintiff,

vs.                                                 **08-CV-0919S**

HSBC USA, INC., and
HSBC BANK USA, NATIONAL ASSOCIATION,

                 Defendants.

_____

# MEMORANDUM OF LAW OF DEFENDANT HSBC BANK USA IN SUPPORT OF ITS OBJECTIONS TO THE MAGISTRATE'S REPORT AND RECOMMENDATION

# I. **PRELIMINARY STATEMENT**

Defendant HSBC Bank USA, National Association ("HSBC") submits this memorandum of law in support of its objections to the Report and Recommendation of the Magistrate Judge denying HSBC's motion for summary judgment ("Report").[1] This is an employment race discrimination case brought under Title VII, 42 U.S.C. 2000e-5, and the New York Human Rights Law ("HRL"), N.Y. Exec. Law § 290 *et seq.*  Plaintiff, who is white, alleges that her supervisor, Linda Bartholomew, who is also white, discriminated against her because of her race when Ms. Bartholomew recommended that plaintiff be terminated during a reduction in force and that two African-American co-workers be retained.  The relevant facts are contained in Defendants' Statement of Undisputed Material Facts (cited herein as "Def. St. ¶ __") which is incorporated herein.

The Report should not be accepted and HSBC's motion granted because the Report errs in concluding that plaintiff has proffered evidence from which a reasonable jury could conclude that HSBC's legitimate, non-discriminatory reason for discharging plaintiff is false and a pretext for race discrimination.  *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (a plaintiff alleging discrimination must prove that the defendant's articulated reason is both false and a pretext for discrimination).  The Report misapplies legal principles, ignores and misinterprets facts, shifts the burden of proof to HSBC, and improperly casts the Court in the role of a "super personnel" department by substituting its own sense of fairness and proper business conduct in place of that of HSBC.

The standard of review for the Report is de novo.  *Finkel v. Romanowicz*, 577 F.3d 79, 84 n.7 (2d Cir. 2009).

---

[1]    Defendant HSBC USA, Inc. does not object to the Report's recommendation that it be dismissed from the action on the ground that it was not plaintiff's employer.

## II. ARGUMENT

### POINT I

### THE REPORT ERRS BY NOT APPLYING THE SAME-ACTOR AND SAME-PROTECTED-CATEGORY INFERENCES

**A.**     **Same-actor Inference**

The same-actor inference is "a highly relevant factor in adjudicating a motion for summary judgment," and "[t]his is especially so when the firing has occurred only a short time after the hiring." *Cordell v. Verizon Commc'ns., Inc.*, 2009 WL 1532267 at *1 (2d Cir. 2009) (Ex. A). The same-actor inference holds that "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997). Existence of the same actor inference supports an inference of non-discrimination. *Chin v. ABN-AMRO North Amer., Inc.*, 463 F. Supp.2d 294, 308-09 (E.D.N.Y. 2006). "It hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job." *Coleman v. Prudential Relocation*, 975 F. Supp. 234, 241 (W.D.N.Y. 1997) (citations and internal quotation marks omitted).

Here, the Report rejects application of the same-actor inference because of alleged "questions of fact as to whether Bartholomew made the decision to hire Plaintiff, or whether Nissenbaum[2] was involved in the decision to hire Plaintiff in the CDD" (Report 36), and because supposedly "a reasonable jury could conclude that Nissenbaum, as well as others in the review process, acquiesced in Bartholomew's decision and that Bartholomew was, in fact, the person

---

[2]     Ms. Bartholomew reported to Daniel Nissenbaum.  (insert citation)

who, for reasons of racial prejudice, terminated plaintiff." (Report 37.)  The Report's reasoning on this point is erroneous in light of the facts.

Plaintiff testified that Ms. Bartholomew is the only person who discriminated against her. (Grasso Dec. Ex. D [Plaintiff Dep.] at.71-72.)  While HSBC admits that Mr. Nissenbaum was involved in the decision to hire plaintiff (Def. St. ¶ 22), the undisputed evidence shows that Ms. Bartholomew was also involved in the hiring process by interviewing plaintiff and recommending her hire.[3]  ("Def. St." ¶¶ 16, 22 and 69.)  Although others may have been involved in the decision to terminate plaintiff, the undisputed evidence shows that, at a minimum, Ms. Bartholomew recommended plaintiff's termination.  (Def. St. ¶ 69).  The Report acknowledges the significance of Ms. Bartholomew's involvement in the termination by stating that the evidence shows that others may have "acquiesced in Bartholomew's decision." (Report 37.)  Thus, Ms. Bartholomew played a significant role in both the decision to hire plaintiff and to terminate her.  The same-actor inference fully applies in such situations as this.  *Campbell v. Alliance Nat'l, Inc.*, 107 F. Supp.2d 234, 248-50 (S.D.N.Y. 2000) (same-actor inference applied where same manager recommended plaintiff's hire and termination even though others participated in decisions because "[t]he decision-makers in the hiring and firing need not mirror each other exactly as long as one management-level employee played a substantial role in both decisions"); *Ralkin v. NYCTA*, 62 F. Supp.2d 989, 1000 (E.D.N.Y. 1999) (same actor inference applied where manager, who may not have actually hired plaintiff, interviewed plaintiff and made the recommendation to hire her and played a significant role in the decision to fire hire).  Accordingly, the same-actor inference should be applied in this case.

---

[3]      Ms. Bartholomew also knew plaintiff before she selected her to be interviewed.  (Def. St. ¶ 17.)

**B.     Same-protected-category Inference**

Similar to the same-actor inference, when a person substantially involved in the decisions

to hire and fire a plaintiff is a member of the same race as the plaintiff that fact creates an

independent same-protected category inference that discrimination did not play a role in the

termination.[4] *Earvin v. City Univ. of New York*, 2008 WL 5740359 at *6 (S.D.N.Y. 2008) (Ex.

B), *aff'd*, 315 Fed. Appx. 358 (2d Cir. 2009); *Chuang v. T.W. Wang Inc.*, 647 F. Supp.2d 221,

233 (E.D.N.Y. 2009).  Here, Ms. Bartholomew, like plaintiff, white. (Def. St. ¶ 18.)  Therefore,

the same-protected category inference also applies.

The Report errs because it fails to apply either the same-actor inference or the same-

protected category inference.  When both inferences exists the inference that the adverse

employment action was not motivated by discrimination is even stronger than would be the case

if only one of them applied.  *See Austin v. Ford Models, Inc.*, 2000 WL 1752966 at *14

(S.D.N.Y. 2000) (collecting cases) (Ex. C), *aff'd sub nom. Austin v. Smith*, 22 Fed. Appx. 76 (2d

Cir. 2001); *Ralkin*, 62 F.Supp.2d at 1000 (the same-actor inference "'is even more weighty

where the person who both hired and fired the plaintiff is also a member of the same protected

class as the plaintiff'") (citation omitted).  The relevance of these inferences applies at the third

stage of the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed.2d 668

(1973), burden-shifting analysis.  The inferences "affect[] the weight to be given to the

employer's proffered non-discriminatory reason for the adverse employment action taken" and

create "'a strong inference that the employer's stated reason for acting against the employee is

not pretextual.'"  *Campbell*, 107 F. Supp.2d at 250 (quoting *Proud v. Stone*, 945 F.2d 796, 798

---

[4]     Aside from the same-protected-category inference, although it is not impossible for an employer to
discriminate against an employee because she is white, it is the "unusual employer" that discriminates against the
majority. *Seils v. Rochester City School Dist.*, 192 F. Supp.2d 100, 110 (W.D.N.Y. 2002) (citing *Parker v.
Baltimore & O.R.R. Co.*, 652 F.2d 1012, 1017 (D.C. Cir. 1981)).

(4th Cir. 1991).)  The inferences are also create "'a powerful inference relating to the 'ultimate issue' that discrimination did motivate the employer.'"  *Id.* (quoting *Proud*, 945 F.2d at 798). The inferences are particularly strong in this case because less than two years passed between Ms. Bartholomew's recommendation that plaintiff be hired into the Community Development Department ("CDD") and her termination.  (Def. St. ¶¶ 10, 72).  *See Ralkin*, 62 F. Supp.2d at 1000.

**POINT III**

**THE REPORT ERRS BY FINDING THERE EXISTS EVIDENCE OF PRETEXT AND THAT PLAINTIFF'S TERMINATION WAS MOTIVATED BY HER RACE**

**A.**     **Introduction**

Plaintiff was terminated during a reduction in force in the CDD that resulted in the elimination of one position.  It is the nature of a reduction in force that employees whose performance would not otherwise result in termination are discharged because of their performance relative to others.[5]*Coleman*  , 975 F. Supp. at 240.  A plaintiff challenging her termination as discriminatory must do more than show that the employer's decision was subjective or arbitrary, that it was unsupported by the facts or merely challenge the employer's business judgment, for none of those things give rise to an inference that the employer acted because of an illegal reason.  *Hines v. Hillside Children's Ctr.*, 73 F. Supp.2d 308, 320 (W.D.N.Y. 1999).  *See also Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 602 (7th Cir. 2001) (evidence that shows the employer incorrectly assessed an employee's abilities does not shed light on whether the employer discriminated); *Coleman*, 975 F. Supp. at 239-40 ("the mere fact

---

[5]     Some courts recognize that an employee terminated as part of a reduction in force "carries a greater burden of supporting charges of discrimination than an employee who was not terminated for similar reasons" because in such cases employees who would not otherwise be fired for poor performance will be terminated based on their relative performance to co-workers. *Ridenour v. Lawson Co.*, 791 F.2d 52, 57 (6th Cir. 1986).

that some of the criteria on which [a] plaintiff was evaluated may have been subjective . . . does not in any way suggest that defendant was motivated by a discriminatory animus"). The federal courts do not sit as a "super-personnel" department to substitute their judgment for that of an employer's. *Scaria v. Rubin*, 117 F.3d 652, 655 (2d Cir. 1997).

**B.    Ms. Bartholomew's Assessment Of Plaintiff's Performance**

Ms. Bartholomew recommended plaintiff be terminated in the reduction in force because she rated plaintiff's performance on both her 2006 mid-year and year-end evaluations as meriting a rating of 4 (inconsistent performance), which was lower than her assessment of plaintiff's two co-workers, Joseph Walker and Letitia Adams. (Bartholomew Dec. ¶¶ 16-22.) Ms. Bartholomew rated plaintiff's overall performance as a 4 on both her mid-year and year-end evaluations. (Bartholomew Dec. ¶¶19-20.) Ms. Bartholomew's assessment is supported by the record, as plaintiff acknowledged at her deposition the deficiencies that Ms. Bartholomew noted in plaintiff's evaluations.

In plaintiff's 2006 mid-year review Ms. Bartholomew evaluated plaintiff in three areas: 1) Maintain systems supporting HMDA and CRA reporting; 2) Prepare and distribute performance and Ad-hoc reports; and 3) Demonstrate thorough understanding of the CRA and HMDA regulation. (Bartholomew Dec. Ex. C.) A **"Management Comments"** section follows each area in which Ms. Bartholomew provides her assessment of plaintiff's performance and a mid-year rating. (Bartholomew Dec. Ex. C.) Ms. Bartholomew rated plaintiff a 3, 4 and 4 in the three areas, respectively. (Bartholomew Dec. Ex. C.) Plaintiff's comments in response to her 2006 mid-year review are contained in what became part of her final review and identified as Exhibit 6 at her deposition. (Bartholomew Dec. Ex. D; *see* Grasso Dec. Ex. E [Plaintiff Dep.] at 125-28.) In her responses plaintiff acknowledges the deficiencies noted in the two areas in

which she was rated a 4.  (Bartholomew Dec. Ex. D p. 2.)  For example, for the area of "Prepare

and distribute performance and Ad-hoc reports" (section 2), Ms. Bartholomew stated in the

**Management Comments** section that plaintiff "needs to be more thorough in checking her work

for errors before submitting to management," that "she must be better focused on the detail of

her work to alleviate time consuming rework" and that plaintiff "also needs to lessen her reliance

on colleagues . . . ."  (Bartholomew Dec. Ex. D p. 2.)  Plaintiff responded by stating:

> I would agree that I need to be more diligent in my efforts in
> completing monthly reports.  I do need to rely on my colleagues
> when the system is broken or not working properly due to
> programming issues that impact my monthly reporting.

(Bartholomew Dec. Ex. D p. 2.)

In the area of "Demonstrate thorough understanding of the CRA and HMDA regulation"

(section 3), Ms. Bartholomew states in the **Management Comments** section that plaintiff "needs

to strengthen her knowledge of regulatory/compliance matters as they pertain to the CDD to

assist in the evaluation of the effects of regulatory changes."  (Bartholomew Dec. Ex. D p. 2.)

Plaintiff states in response:  "This has been an ongoing effort for me.  I update the Regulation

book and read changes that come in on a monthly basis.  I was advised by my manager to direct

all regulatory questions to her."  (Bartholomew Dec. Ex. D p. 2.)

When Ms. Bartholomew completed plaintiff's 2006 year-end review she gave plaintiff

ratings of 4, 5 and 4 for each of the three areas, respectively, and an overall rating of 4.

(Bartholomew Dec. Ex. D [bates pages P000096-99.)  In the **Management Comments** section

of each area Ms. Bartholomew explained the reasoning for her assessment.  (Bartholomew Dec.

Ex. D [bates pages P000096-99.)  Ms. Bartholomew's comments on plaintiff's year-end review

are consistent with her comments on plaintiff's mid-year review.  When asked at her deposition

why she thought her rating should have been different plaintiff merely stated she thought her

performance was better than what Ms. Bartholomew rated her.  Plaintiff testified on that point as follows:

> Q.    And why do you think it should have been at least a three?
>
> A.    I feel I was doing a good job. . . . I just feel this is - - it was not a fair assessment of my work performance.

(Grasso Dec. Ex. D [Plaintiff Dep.] at 144.)  Despite plaintiff's feelings about her performance, she acknowledged at her deposition many of the deficiencies Ms. Bartholomew noted in the year-end review.  For instance, plaintiff acknowledged that that there were typographical errors in a report she prepared that caused the report to have to be redistributed and that she made other typographical errors.  (Grasso Dec. Ex. D [Plaintiff Dep.] at 145-46, 155-56.)  She acknowledged that she had been working to improve her CRA Wiz deficiencies.  (Grasso Dec. Ex. D [Plaintiff Dep.] at 146-47.)  She acknowledged that she was unable to field questions or resolve issues with the multi-family database.  (Grasso Dec. Ex. D [Plaintiff Dep.] at 147-48.)  She also acknowledged that Ms. Bartholomew had spoken to her during the year about her lack of attention to her work, her need to be more attentive to her work and less concerned about personal matters, and taking excessive cigarette breaks, all of which were noted in her year-end review.  (Grasso Dec. Ex. D [Plaintiff Dep.] at 157-58.)

**C.    The Report's Recommendation Should Be Set Aside And HSBC's Motion Granted**

Contrary to the Report's conclusion, plaintiff has not met her burden of showing that HSBC's explanation for her termination is both false and that the real reason she was terminated is her race.  The Report erroneously finds that there are "issues of fact as to whether Bartholomew manipulated the 2006 year-end ratings so as to justify terminating Plaintiff . . . ." (Report 41.)  The Report errs in so finding because it: (1) bases its holding on conjecture and surmise; (2) improperly considers the intent of persons whose intent is not relevant; (3)

improperly places the burden of proof on HSBC; and (4) makes the Court a "super personnel" department by substituting its judgment of proper management procedures in place of HSBC's.

For example, regarding a series of e-mails between Ms. Bartholomew and her manager, Mr. Nissenbaum, in which Ms. Bartholomew defends her rating plaintiff, the Report states that the evidence "strongly suggest Nissenbaum still had reservations about rating Plaintiff as low as 4." (Report 42.) Whether Mr. Nissenbaum had such reservations is irrelevant. Plaintiff asserts a "cat's paw" theory that Ms. Bartholomew's recommendation was motivated by her race and that Mr. Nissenbaum acquiesced to it. (Report 37.) It is the discriminatory intent of the individual alleged to have tainted the decision process that is relevant, not the intent of the non-biased person's involved. *See Bickerstaff v. Vassar College*, 196 F.3d 435, 450 (2d Cir. 1999). It is undisputed that Mr. Nissenbaum was not motivated by plaintiff's race, as plaintiff testified that Mr. Nissenbaum did not discriminate against her. (citation) Thus, Mr. Nissenbaum's intent is not an issue and any "reservations" he had were his own and are not probative of Ms. Bartholomew's intent.

The Report cites a series of e-mails between Mr. Nissenbaum and Anthony Manna and others from HSBC's Human Resources Department about a request that the decision to terminate plaintiff be reviewed to determine if it raised any discrimination concerns. (Report 42.) The Report finds that this raises a jury issue because it "begs the question – if Plaintiff were, in fact, such a poor performer, why did Defendants' managers raise concerns about legal action if Plaintiff were terminated." (Report 42.) This reasoning is fundamentally flawed. Whether plaintiff was in fact such a poor performer is not an issue on this motion. Rather, the issue is whether Ms. Bartholomew "genuinely and honestly made . . . an attempt to select employees to be retained on the basis of performance related considerations." *Aungst v. Westinghouse Elec.*

- 9 -

*Corp.,* 937 F.2d 1216, 1224 (7th Cir. 1991) (internal quotation marks and citations omitted);

*accord Richane v. Fairport Cent. Sch. Dist.,* 179 F. Supp.2d 81, 89 (W.D.N.Y. 2001); *Bucknell*

*v. Refined Sugars, Inc.,* 82 F. Supp.2d 151, 157 (S.D.N.Y.), *aff'd,* 225 F.3d 645 (2d Cir. 2000);

*see also Droutman v. New York Blood Ctr., Inc.,* 2005 WL 1796120 at *9 (2005 E.D.N.Y.) (an

employer's honest belief about an employee's conduct, even if wrong, is a legitimate reason to

terminate her and does not constitute pretext) (Ex. D); *Valentine v. Standard & Poor's,* 50 F.

Supp.2d 262, 289 n.17 (S.D.N.Y. 1999) (it is irrelevant whether in fact plaintiff engaged in the

conduct leading to termination, "it matters only that the employer subjectively believed that this

was so"), *aff'd,* 205 F.3d 1327 (2d Cir. 2000).

Second, stating that something "begs the question" is merely another way of saying that

the situation is suspicious.  Raising a suspicion is not sufficient to defeat HSBC's motion.

*Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir. 1995) (conjecture and

surmise are insufficient to defeat a motion for summary judgment).  A suspicion is just

speculation and does not set forth the "concrete particulars" required to avoid summary

judgment.  *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir. 1984).

Third, finding that reviewing a termination decision to ensure that discrimination is not

occurring is itself evidence of discrimination is illogical and lacks legal foundation.  It is

virtually standard practice for employers to review termination decisions to prevent

discrimination and the goal of the discrimination laws are furthered by employers doing so.  The

Report's reasoning creates the absurd situation of punishing employers for making efforts to

comply with the law.  Under the Report's reasoning an employer that reviews its decisions to

prevent discrimination and, thereby, comply with the law, faces a greater risk of liability for

doing so than if it does not.  That would undermine the discrimination laws because employers

would be encouraged to simply stick their heads in the sand and not review the employment decisions of their managers for fear of having the fact that they reviewed the decisions used against them, as does the Report.

Also, that other person's wanted Ms. Bartholomew's decision reviewed is not probative of her intent in recommending plaintiff's termination. Nor is the fact that the Human Resources Department conducted the review of any relevance. The Human Resources conducted a review only for possible adverse impact discrimination. (Report 50-51.) Unlike a disparate treatment claim, such as plaintiff alleges, adverse impact discrimination does not require a finding of intent. *Lowe v. Commack Union Free Sch. Dist.*, 886 F.2d 1364, 1369 (2d Cir. 1989).

The Report also erroneously relies on the fact that Mr. Manna, a former Human Resources employee who was involved with plaintiff's termination, testified that had he known that others had asked if there were any "issues" with terminating plaintiff he would have been "concerned." (Report 43.) As discussed above, the determinative issue here is whether Ms. Bartholomew had a discriminatory intent based on plaintiff's race when she recommended that plaintiff be terminated. That Mr. Manna would have been "concerned" if he had known others had asked for an adverse impact review of the decision is not probative of Ms. Bartholomew's intent and in no case rises to the level of being a "concrete particular[]" showing that a trial is needed. *R.G. Group, Inc.*, 751 F.2d at 77. His perception is irrelevant.

The Report also applies the wrong legal standard and improperly shifts the burden of proof to HSBC. The Report states that Ms. Bartholomew's statement in her e-mail of January 5, 2007, that plaintiff is not performing at the "meets expectations" level is not "conclusive proof that Plaintiff's job performance had fallen to an unacceptable level." (Report 43.) Whether plaintiff's performance had fallen to an objectively unacceptable level is not germane on this

motion for two reasons.  First, plaintiff was terminated not because her performance was unacceptable, but because Ms. Bartholomew believed it was lower than her co-workers. (Def. St. ¶ 71.)  *See Coleman*, 975 F. Supp. at 240 (a reductions in force by nature results in the termination of employees who would not otherwise be terminated).  Second, what is germane is Ms. Bartholomew's perception of plaintiff's performance and whether there is evidence that she did not believe plaintiff's performance was weaker than her co-workers.  *Dale*, 797 F.2d at 464-65 (it is the perception of the decisionmaker that is relevant).

Also, by requiring proof that plaintiff's performance had fallen to an "unacceptable level" the Report shifts the burden of proof to HSBC.  HSBC's burden is only one of production to articulate a legitimate, nondiscriminatory reason for terminating plaintiff.[6]  *Fisher v. Vassar College*, 114 F.3d 1332, 1335-36 (2d Cir. 1997) (*en banc*).  To defeat HSBC's motion plaintiff must come forward with evidence that HSBC's reason is both false and a pretext for discrimination.  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000).  "It is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519, 113 S. Ct. 2742, 125 L. Ed.2d 407 (1993).  HSBC does not at any time have the burden to prove that plaintiff's performance was unacceptable.  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed.2d 207 (1981).  That burden is to submit concrete particulars showing that Ms. Bartholomew did not believe plaintiff's performance was not as good as her co-workers.

---

[6]     The Report correctly determines that HSBC has meet its burden of production. (Report 34.)

The Report also states that "circumstances surrounding" Ms. Bartholomew's statement in her January 5, 2007, e-mail to Mr. Nissenbaum "call into question Bartholomew's credibility and suggests Bartholomew is attempting to persuade Nissenbaum to acquiesce in Bartholomew's decision that the CRA Position held by Plaintiff should be eliminated, and that Plaintiff's 2006 job performance ratings of 3[2] *(sic)* were not accurate." (Report 43.) The Report's conclusion is wrong and again applies the incorrect legal standard. That Ms. Bartholomew is attempting in the e-mail to get Mr. Nissenbaum to agree with her does not create a credibility issue. Under a "cat's paw" theory, which plaintiff asserts here, the alleged biased actor by necessity must attempt to get others to accept her recommendation for the theory to apply. For liability to attach there must be evidence that the person whose recommendation was accepted was motivated by discrimination. *See Bickerstaff*, 196 F.3d at 450. However, the act of recommending that plaintiff be terminated is not probative of Ms. Bartholomew's intent for doing so and, therefore, does not create a credibility issue about whether or not Ms. Bartholomew believed plaintiff's performance was not as good as her co-workers.

Nor does the e-mail itself show that Ms. Bartholomew did not believe plaintiff's performance was not as good as that of her co-workers  Ms. Bartholomew's January 5th e-mail to Mr. Nissenbaum is her response to his inquiries about whether her rating of plaintiff is warranted. Ms. Bartholomew explicitly restates her position that she believes plaintiff's performance is not at the "meets expectations" level by making the qualifying parenthetical statement "(which she is not)." (Report 43.) Thus, Ms. Bartholomew's position in the e-mail is consistent with her assessment of plaintiff's performance throughout 2006 and HSBC's articulated reason for terminating plaintiff. Ms. Bartholomew's statement to Mr. Nissenbaum in

---

[2]     Plaintiff's 2006 ratings were actually a 4.  The number 3 in the Report's is a typographical error.

the e-mail that she recognized that plaintiff would have an argument for not being the employee to be terminated if she were performing at a higher level is not evidence that Ms. Bartholomew believed that to be the case, but merely recognition of a position that could be asserted under different facts. Accordingly, the e-mail does not raise a credibility issue on that point either.

The Report also errs when it states that the January 5th e-mail suggests "that Plaintiff's 2006 job performance ratings of 3 *(sic)* were not accurate" because it again applies the wrong legal standard. As a matter of law, that Ms. Bartholomew's rating of plaintiff may have been wrong does not create an inference that HSBC acted because of an illegal reason. *See Olsen*, 267 F.3d at 602 (evidence that the employer incorrectly assessed an employee's abilities does not shed light on whether the employer discriminated); *Hines*, 73 F. Supp.2d 308, 320 (W.D.N.Y. 1999) (evidence that the employer's decision was subjective, arbitrary or unsupported by the facts does not create an inference that the employer acted because of an illegal reason).

The Report also states that "prior to her 2006 mid-year performance review, Plaintiff had never received an overall rating worse than 3,"implying that Ms. Bartholomew's 4 ratings of plaintiff in 2006 must have been discriminatory. (Report 43.) The Report's reasoning is based on the mistaken belief that prior good performance necessarily guarantees good performance forever after. The reality is that an employee's performance is not static and can change at any time for better or worse. As a matter of law, prior satisfactory evaluations provide very little, if any, weight tending to show that a later termination related to poor performance was based on discrimination. *Viola v. Philips Med. Sys.*, 42 F.3d 712, 718 (2d Cir. 1994); *Adia v. MTA Long Island Rail Road Co.*, 2006 WL 2092482 at *7 (E.D.N.Y. 2006) (Ex. E); *Davis v. Oyster By-East*, 2006 WL 657038 at *11 (E.D.N.Y. 2006) (Ex. F). A change in management's evaluation of an employee does not raise an inference of pretext. *Brown v. Time, Inc.*, 1997 WL 231143 at

*12 (S.D.N.Y. 1997) (Ex. G); *see also Beers v. Nynex Material Enter. Co.*, 1992 WL 8299 at *11 (S.D.N.Y. 1992) ("it would be perverse to find that, if a negative review is preceded by a positive review, the negative review is necessarily false. . . ") (Ex. H). An inference of discrimination is even less permissible when the change in management's evaluation of an employee occurs, as it did here, under a new supervisor because each supervisor is entitled to set and measure an employee according to her own standards and agenda. *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985); *Brown*, 1997 WL 231143 at *12.

The Report goes on to cite instances of Ms. Bartholomew not including certain items in plaintiff's 2006 mid-year and year-end evaluations and allegedly criticizing plaintiff for things which she did not criticize her co-workers as evidence of race discrimination. The Reports errs by relying on such instances because they do not create an inference of discrimination. The Report cites the fact that Ms. Bartholomew did not amend plaintiff's 2006 review to reflect duties she performed for Phil Deterville as Mr. Nissenbaum requested as evidence of discrimination. (Report 43.) What to include in an evaluation is a business decision. By finding that the absence of any reference in plaintiff's evaluation to her work for Mr. Deterville suggests race discrimination the Report improperly substitutes the Court's judgment of what should be contained in plaintiff's evaluation for that of HSBC's judgment as exercised by Ms. Bartholomew. *See Scaria*, 117 F.3d at 655 (the federal courts do not sit as a "super-personnel" department to substitute their judgment for that of an employer's). Plaintiff's challenge to her evaluation on the ground that Ms. Bartholomew did not consider her work for Mr. Deterville is merely a challenge to Ms. Bartholomew's business judgment of what to include in her evaluation. However, such a challenge does not create an inference of discrimination. *See Hines*, 73 F. Supp.2d at 320 (showing that an employer's conduct was subjective, arbitrary or

unsupported by the facts or merely challenging the employer's business judgment does not give rise to an inference of discrimination).

The Report also states that the fact that Ms. Bartholomew did not consult with Mr. Deterville about the quality of plaintiff's performance is "circumstantial evidence [that] establishes an issue of fact as to whether Plaintiff's job performance in 2006 actually justified the 4 job performance rating she received, or was a pretext . . . ." (Report 45.) The Report again errs by doing so because it applies the wrong standard in determining if an issue of fact exists. As discussed above, whether Ms. Bartholomew's rating of plaintiff performance as a 4 was justified is not relevant on this motion. *See Olsen*, 267 F.3d at 602 (evidence that the employer incorrectly assessed an employee's abilities does not shed light on whether the employer discriminated). To establish evidence of pretext plaintiff must present evidence showing that Ms. Bartholomew did not believe plaintiff warranted a 4 rating, not that the rating was not objectively justified. *See, e.g., Droutman*, 2005 WL 1796120 at *9 (an employer's honest belief about an employee's conduct, even if wrong, is a legitimate reason to terminate her and does not constitute pretext). That Ms. Bartholomew did not consult with Mr. Deterville shows at most that she was not as diligent as she possibly could have been in assessing plaintiff's performance and that she discounted the importance of considering plaintiff's work for Mr. Deterville. *See Hines*, 73 F. Supp.2d at 320 (arbitrary conduct is not evidence of discrimination). Also, underpinning this statement is the faulty theory that plaintiff can create an issue of fact by disagreeing with her supervisor's assessment of her performance and showing that her supervisor did not assess her performance as she believes it should have been assessed. *See Crawford-Mulley v. Corning, Inc.*, 194 F. Supp.2d 212, 219 (W.D.N.Y. 2002) (a plaintiff's own opinion of her qualifications is insufficient to prove discrimination); *Layaou v. Xerox Corp.*, 999 F. Supp.

426, 433 (W.D.N.Y. 1998) (the opinion of the plaintiff and other non-decision makers about her

performance is insufficient to prove discrimination); *accord Brown v. Society for Seaman's*

*Children*, 194 F. Supp.2d 182, 191 (E.D.N.Y. 2002). Evaluations by nature are subjective and

the "fact that some of the criteria on which [a] plaintiff was evaluated may have been subjective .

. . does not in any way suggest that defendant was motivated by a discriminatory animus."

*Coleman*, 975 F. Supp. 234 239-40 (W.D.N.Y.).

The Report also cites as evidence of pretext that "Bartholomew gave Plaintiff an overall

rating of 4 . . . with awareness that such rating would be used to justify Plaintiff's termination,

and gave Walker and Adams overall ratings of 3, assuring their retention." (Report 44.) Of

course Ms. Bartholomew knew what effect her rating would have. A position was being

eliminated and she had to choose who would be terminated. That fact is not evidence that Ms.

Bartholomew acted with a discriminatory intent when she prepared the evaluations. It is merely

a statement of fact about what happened. Nor is the fact that plaintiff is white and Mr. Walker

and Ms. Adams are African-American evidence that Ms. Bartholomew selected plaintiff because

of her race. *See Coleman*, 975 F. Supp. at 245 (fact that female employee was terminated and

male employees retained in reduction in force not probative of sex discrimination); *Richane*, 179

F. Supp.2d at 87 (fact that younger applicants were chosen over older applicants does not

establish age discrimination). There must be evidence of discriminatory intent, which is absent.

The Report also relies on differences between the content of plaintiff's evaluations and

those of Letitia Adams, one of plaintiff's African-American co-workers, as evidence of pretext.

(Report 44-45.) The Report faults how Ms. Bartholomew completed the evaluations because she

did not consider the same exact items in each evaluation or was apparently more critical of

plaintiff in some areas. By doing so, the Report again improperly places the Court in the

position of acting as a super-personnel department by second guessing Ms. Bartholomew's

decisions of what to include and leave out of the evaluations. Evaluations are highly subjective

and simply because there are variances in plaintiff's and Ms. Adams's reviews does not create an

inference that Ms. Bartholomew did not believe her assessment of each was accurate. Nor is

there any evidence that Ms. Bartholomew included or left out items in plaintiff's or Ms. Adams's

reviews or was more or less critical toward either because of race. There is no comparative

evidence in the record from which a reasonable jury could conclude that any differences in their

evaluations was because of race. For example, there is no evidence concerning whether plaintiff

and Ms. Adams had the same or different level of responsibility on any particular project, the

seriousness or impact of any deficient performance either may have exhibited, the reason for any

problems either may have experienced or any other circumstances surrounding their respective

performances. Ms. Adams's difficulties with the State Report Card may very well have been

dues to technical issues beyond her control, while plaintiff's difficulties may have been due to

her failure to focus on her work and plaintiff's mistakes may have caused greater embarrassment

for Ms. Bartholomew than those of Ms. Adams. Plaintiff acknowledged at her deposition that

she made typographical errors in a report that required that it be revised and redistributed.

(Grasso Dec. Ex. D [Plaintiff Dep.] at 145-46, 155-56). Without such comparative evidence,

which plaintiff has the burden to produce, any conclusion that the differences in their reviews is

based on race rather than some other reason is speculation. *See Shumway v. United Parcel Serv.,*

*Inc.*, 118 F.3d 60, 63-64 (2d Cir. 1997) (there must be comparative evidence from which to find

discriminatory intent); *accord Neratko v. Frank*, 31 F. Supp.2d 270, 283-87 (W.D.N.Y. 1998).

Also contrary to the Report's findings (Report 44), "Strong skills in . . . computer systems programming" is explicitly listed in plaintiff's job description under Section III, Knowledge, Skills and Abilities. (Bartholomew Dec. Ex. A.)

Plaintiff has not submitted sufficient evidence to show that HSBC's explanation for her termination, that Ms. Bartholomew believed her performance to be lower than that of her co-workers, is false. Plaintiff admitted at her deposition most of the performance deficiencies that Ms. Bartholomew noted in her 2006 evaluations. (*See* p.8 above.) The evidence cited in the Report fails to create an inference of discrimination for the reasons discussed. The insufficiency of plaintiff's evidence is even greater when the same-actor and same-protected-category inferences are applied. *See Campbell*, 107 F. Supp.2d at 250; *Proud,* 945 F.2d at 798.

Moreover, even if plaintiff's disagreement about the fairness or accuracy of her evaluations creates a factual dispute about whether the real reason Ms. Bartholomew recommended her for termination was her performance, ""the creation of a genuine issue of fact with respect to pretext alone is not sufficient."" *Ralkin*, 62 F. Supp.2d at 1001 (quoting *Grady*, 130 F.3d at 561).) "There must also be evidence that would permit a rational fact finder to infer that the discrimination was actually motivated . . . by discrimination on the basis of her race . . . ." *Id.* Plaintiff has not produced such evidence.

In finding evidence that Ms. Bartholomew was motivated by plaintiff's race, the Report cites several race-related statements by Ms. Bartholomew about which it states that "a reasonable jury could find the remarks revealed a consistently strong personal bias to favor black employees over whom she held supervisory authority." (Report 46-48.) The Report's conclusion is wrong. The Report improperly accepts wholesale that Ms. Bartholomew's statements indicate a discriminatory intent without any consideration of their context or relevance to showing race

discrimination in the decision to terminate plaintiff.  Although the Report cites the Second

Circuit's decision in *Tomassi v. Insignia Financial Group, Inc.*, 478 F.3d 111 (2d Cir. 2007), as

support for its conclusion, *Tomassi* does not hold, as the Report implies, that all remarks are

always relevant to the issue of discrimination.  Rather, *Tomassi* explicitly states that "all

comments pertaining to a protected class are not equally probative or discrimination" and makes

clear that a court must still consider all relevant factors that bear on determining whether the

comments tend to show that the adverse employment action was motivated by discrimination.

*See id.* at 115-16.  Ms. Bartolomew's statements do not show that she preferred working with

African-American employees over white employees as none of them are related to the African-

American employees' performance, her evaluation of their performance, her interaction with

them in workplace, or the decision of whom to retain in the reduction in force.  Nor do they show

that she held any animus towards white employees.

1.   **Ms. Bartholomew's statements at the employee holiday party**

During a holiday party in December 2006 when the topic of reincarnation was being

discussed Ms. Bartholomew made a statement to the effect that she dreamed of black people so

that maybe she was a black person in a previous life.  (Grasso Dec. Ex. E [Bartholomew Dep.] at

220-23.)  She also said during the party that she likes black music and listens to radio station

WBLK.  (Grasso Dec. Ex. E [Bartholomew Dep.] at 225.)  Neither comment relates to the

workplace or the decision-making process that led to plaintiff' termination.  Nor does the content

of either remark suggest that Ms. Bartholomew harbored a discriminatory animus against whites.

One statement simply recounts a dream and the other expresses her taste in music.  To find that

these statements suggest she harbored a preference for black employees and animus towards

white employees would sanction a jury to interpret Ms. Bartholomew's dreams to discern her

intent and hold Ms. Bartholomew responsible for her dreams.  Plaintiff herself admits that

dreaming about black people does not show that Ms. Bartholomew was biased in favor of African-Americans. (Grasso Dec. Ex. D [Plaintiff Dep.] at 87-88.) To find that her comment about liking black music suggests the same would require a jury to rely on racial stereotypes, which plaintiff's own testimony on the issue amply demonstrates:

> Q. Well, my question is, what is it about the statement that when she said she loved black music that makes you think that she was biased in favor of African-Americans?

> A. Because they're African-Americans, and that's the music that they listen to.

(Grasso Dec. Ex. D [Plaintiff Dep.] at 84.) The absurdity of such a position is further shown by plaintiff's testimony that although she herself likes to listens to music by African-American music artists that does not mean she is biased in favor of African-Americans over white people. (Grasso Dec. Ex. D [Plaintiff Dep.] at 85-86.)

### 2.   Ms. Bartholomew's statement about being a white grandmother

Ms. Bartholomew also made the statement that she could be the white grandmother of Ms. Adams's newborn baby. (Grasso Dec. Ex. D [Plaintiff Dep.] at 78-80.) Ms. Bartholomew was standing near plaintiff and Ms. Adams while they were discussing the difficulty of raising a child without having any family in the area. (Grasso Dec. Ex. D [Plaintiff Dep.] at 79-80.) While they were doing so Ms. Bartholomew joined the conversation and subsequently made the statement. (Grasso Dec. Ex. D [Plaintiff Dep.] at 79-80.) Nothing in the content or context of the statement suggest Ms. Bartholomew favors working with African-Americans over white employees. The comment is an expression of personal support for Ms. Adams and is unrelated to plaintiff's termination or her performance. Ms. Bartholomew's use of the word white to describe herself is merely a descriptive of her own race but does not suggest racial bias.

### 3.   Ms. Bartholomew's statement about attending Mr. Walker's church

At an unspecified time plaintiff and Mr. Walker were discussing their respective churches and the differences between their services. (Grasso Dec. Ex. D [Plaintiff Dep.] at 95-98.) Ms. Bartholomew again joined the conversation and said that she would like to attend Mr. Walker's church. (Grasso Dec. Ex. D [Plaintiff Dep.] at 97.) Mr. Walker stated that most of the people who attended his church did not look like her to which Ms. Bartholomew responded that she wanted to go even though she was white. (Grasso Dec. Ex. D [Plaintiff Dep.] at 97.) No reasonable juror could infer from Ms. Bartholomew's statement a preference for African-American employees, animus towards white employees or that Ms. Bartholomew was motivated by plaintiff's race. Nor is the statement related in any way to plaintiff's termination or her performance. Ms. Bartholomew merely expressed an interest in learning about Mr. Walker's church, which is exactly what plaintiff was doing in the conversation.[8]

Comparison to other cases shows that Ms. Bartholomew's comments do not cross the threshold of indicating racial animosity. *See Coleman*, 975 F. Supp. at 242-44 (supervisor's statements "That black bitch pissed me off" and "I'm sick of that nigger" not related to termination decision not evidence of race discrimination) (collecting cases). The Report's finding that the statements show a preference for African-American employees is based solely on the insufficient fact that Ms. Bartholomew referred to race.

The Report's finding that the fact that Ms. Bartholomew allegedly did not "admonish Walker for his tardiness" is evidence of a discriminatory motive is also wrong. (Report 48.) Plaintiff alleges that Mr. Walker "was consistently late." (Grasso Dec. Ex. D [Plaintiff Dep.] at 72.) There is no evidence in the record that Mr. Walker "was consistently late" to work. The

---

[8]    Contrary to the Report's statement that "[n]othing in the record indicate *(sic)* "whether Bartholomew admits or denies making the statements regarding wanting to attend Walker's church" (Report 46, n. 34), that fact is clearly admitted by HSBC in the record. (Def. St. ¶ 77.)

Report concedes this by stating that Ms. Bartholomew's "failure to admonish Walker's tardiness" would be evidence of discrimination "**if such tardiness occurred**." (Report 49.) The Report cites no evidence that shows it in fact occurred. Rather, the Report again improperly shifts the burden of proof to HSBC by finding HSBC's alleged failure to deny the fact as evidence that it occurred. (Report 49, n. 36.) Moreover, the existence of any such tardiness would not create a genuine issue of material fact because plaintiff's attendance was not one of the factors on which Ms. Bartholomew evaluated plaintiff's performance. (Bartholomew Dec. Exs. C and D.)

The Report's finding that Ms. Bartholomew's display of pictures of she and Mr. Walker and she and her second-level supervisor Loretta Abrams, is evidence of a "racial preference" for African-Americans is also wrong. (Report 49.) The pictures were taken during a business trip. (Grasso Dec. Ex. D [Plaintiff Dep.] at 88-90.) There is no evidence that any pictures were taken of Ms. Bartholomew and plaintiff or any other white employees that Ms. Bartholomew refused to display or that Ms. Bartholomew refused to have her picture taken with any white employee. No reasonable jury could conclude that Ms. Bartholomew preferred working with African-American employees over white employees because she displayed pictures of herself and a subordinate and herself and a superior taken at a department meeting. The pictures are unrelated to plaintiff's termination or Ms. Bartholomew's evaluation of any employee and in no way suggests Ms. Bartholomew was motivated by race in terminating plaintiff.

The Report's statement that Ms. Bartholomew's testimony about Ms. Adams training Mr. Walker before Ms. Adams left on maternity leaves raises a credibility issue is just plainly wrong. (Report 49-50.) When she testified on this issue Ms. Bartholomew qualified her testimony by stating that she was "not exactly sure of the time line." (Grasso Dec. Ex. E [Bartholomew Dep.]

at 85.)  Plaintiff's counsel then showed Ms. Bartholomew the relevant e-mail and asked her

"does this refresh your recollection that Joe Walker started after Letitia had already left" to

which Ms. Bartholomew replied:  "Yeah, it does now.  I didn't remember."  (Grasso Dec. Ex. E

[Bartholomew Dep.] at 87.)  Thus, there is no inconsistency between her testimony and the cited

e-mail.

Contrary to the Report's conclusion, the evidence does not show an inconsistency

between HSBC's EEOC Response and its position on this motion.  (Report 50-53.)  As the

Report itself notes, the EEOC Response states that plaintiff was selected because she was rated a

4 for her 2006 performance.  (Report 50-51.)  That is the same position presented on this motion.

The Report's conclusion that HSBC asserted in the EEOC Response that its Human Resources

Department selected plaintiff is wrong and ignores the evidence.  The Report fails to mention

that in the e-mail from Mr. Manna to Mr. Gawel that it cites Mr. Manna states the following:

> All three of these individuals report to Linda Bartholomew.  The
> request is to eliminate one of the CRA Mapping Analyst roles.
> Dawn Riley was rated a "4" at mid year and "4" at year end.  She
> is the one that **they would choose to RIF** based purely on the
> fact that if they had to lose one person **they would select** the
> individual that has not performed as well as the others.

(Hebeler Dec., attached EEOC response, Ex. F – doc. # HSBC 00086.)  (Bold added.)  Thus, Mr.

Manna is telling Mr. Gawel, before the adverse impact review is conducted, that the CDD, which

Ms. Bartholomew and Mr. Nissenbaum supervised, had already told him plaintiff was the

employee they wanted to terminate.  The adverse impact review was a post-selection risk

assessment and does not show that the Human Resources Department was involved in  selecting

plaintiff for termination.

That Ms. Bartholomew complimented plaintiff's performance of certain tasks in 2006

does not create an inference of pretext.  Simply because Ms. Bartholomew rated plaintiff's

overall 2006 performance as a 4 does not mean that every task plaintiff performed in the year was below expectations. Ms. Bartholomew's recognition of those instances when plaintiff performed well does not suggest Ms. Bartholomew did not believe her overall assessment, especially in light of plaintiff's acknowledgment of her deficiencies listed in her reviews. *See Beers*, 1992 WL 8299 at *11 (award of a bonus does not negate an employer's account of an employee's poor performance).

Lastly, the Report's conclusion that the racial make up of the CDD is evidence that Ms. Bartholomew "preferred workers who were African-American over those who were Caucasian" is unsupportable as a matter of fact and law. (Report 55-56.) Such a conclusion is based on pure speculation because there is no evidence about the reasons for any of the other personnel changes that occurred or whether Ms. Bartholomew was involved in them or in what respect she was involved. The racial make up of the CDD that the Report cites is merely a bottom-line statistic showing the composition of the department. Such statistics are worthless because the existence of a bottom-line imbalance in the work force between a protected and an unprotected group of employees is insufficient to prove discrimination. *Lopez v. Metropolitan Life Ins. Co.*, 930 F.2d 157, 159 (2d Cir. 1991). The sample size of the CDD is also too small to give rise to an inference of discrimination. *See Beers*, 1992 WL 8299 at *11.

## III.  CONCLUSION

No reasonable jury could conclude that HSBC Bank's explanation for terminating plaintiff is false and that the real reason she was terminated is because she is white. Plaintiff has not come forward with sufficient evidence to show that HSBC's explanation, that Ms. Bartholomew selected whom to terminate and whom to retain in the reduction in force based on her honest belief about the employees' relative performance, is false. Even if such evidence

existed, there is insufficient evidence to conclude that Ms. Bartholomew was motivated by

plaintiff's race, rather than some other reason. The insufficiency of plaintiff's evidence is

particularly apparent when it is considered in light of the same-actor and same-protect-category

inferences. Plaintiff's evidence of discrimination consists essentially of speculation, plaintiff's

subjective feelings of discrimination and her subjective disagreement with Ms. Bartholomew's

assessment of her performance. Therefore, HSBC's motion for summary judgment should be

granted.

Dated: February 22, 2011

> PHILLIPS LYTLE LLP
>
> By s/ James R. Grasso
>     James R. Grasso, Esq.
> Attorneys for Defendant HSBC Bank USA, National
>   Association
> 3400 HSBC Center
> Buffalo, New York  14203-2887
> Telephone No. (716) 847-8400
> jgrasso@phillipslytle.com

Doc # 01-2442307.1

## CERTIFICATION OF OBJECTIONS

The undersigned hereby certifies that the foregoing Objections to the Magistrate's Report and Recommendation do not raise new legal or factual arguments not raised before the Magistrate Judge.

Dated:  February 22, 2011

PHILLIPS LYTLE LLP

By s/  James R. Grasso
    James R. Grasso, Esq.
Attorneys for Defendant HSBC Bank USA, National
    Association
3400 HSBC Center
Buffalo, New York 14203-2887
Telephone No. (716) 847-8400
E-mail:  jgrasso@phillipslytle.com

Doc # 01-2444616.1